Reversed and Rendered in Part, Reversed and Remanded in Part, Affirmed
in Part, and Opinion filed November 1, 2007








Reversed and Rendered in Part, Reversed and Remanded
in Part, Affirmed in Part, and Opinion filed November 1, 2007.

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-05-00860-CV

_______________

 

AVCO CORPORATION, TEXTRON LYCOMING RECIPROCATING
ENGINE DIVISION OF AVCO CORPORATION, Appellant

 

V.

 

INTERSTATE SOUTHWEST, LTD., Appellee

                                                                                                                 
                              

On Appeal from the 278th District Court

Grimes County, Texas

Trial Court Cause No. 29,385

                                                                                                                              
                 

 

O P I N I O N








In this commercial dispute, we are
asked to determine questions regarding standing and capacity, the proper scope
of declaratory relief, and the application of the express-negligence rule, as
well as traditional sufficiency challenges to certain evidence.  The appellant,
an aircraft engine manufacturer, contracted with a forging company for the
production of crankshaft forgings made to the manufacturer=s specifications.[1] 
After a series of crankshaft failures, an affiliate of the forging company sued
the engine manufacturer, alleging that the manufacturer wrongfully concealed
information about the failures, fraudulently induced the forging company to
extend the contract, and obtained the execution of a contract extension by
deception.  The affiliate also sought a ruling that the manufacturer was not
entitled to contractual indemnity.  The jury found in favor of the affiliate on
its fraud claims and awarded it damages for increased insurance premiums and
fees for expert witnesses, together with attorneys= fees, costs, and more than $86 million
in exemplary damages.  We conclude that the affiliate has standing to assert
the claims at issue, but the evidence is legally insufficient to support the
actual damages awarded.  We therefore reverse and render judgment that the
affiliate take nothing, but we affirm the trial court=s conclusion that the contractual
indemnity provision at issue is unenforceable under both Texas and Pennsylvania
law.  We remand solely for the determination of the appropriate amount of
attorneys= fees and costs, if any, to award to either party in light of our rulings
on the dispositive issues.

I.  Factual
and Procedural Background

A.        The
Master Supply Agreement

Appellant Textron Lycoming
Reciprocating Engine Division of AVCO Corporation (ALycoming@) manufactures aircraft engines, but
does not manufacture all of the component parts.  On May 4, 1995, Lycoming
entered into a Master Supply Agreement (AMSA@) to obtain crankshaft forgings from
Wisconsin corporation Interstate Forging Industries, Inc. (AIFI@).[2] 
The forgings were to be made to Lycoming=s specifications, and the MSA
provides that IFI Awill not delegate or subcontract any of the work or duties to
be performed hereunder without the prior written consent@ of Lycoming.[3] 









The MSA also includes asymmetrical
indemnification provisions.  Section 5.3, paragraph 1 of the MSA provides:        

Buyer [Lycoming] shall indemnify,
reimburse, and hold Seller [IFI] harmless, its subsidiaries and affiliates and
their respective officers, directors and employees from and against any and all
losses, liabilities, claims, costs, demands, judgements [sic], penalties,
fines, interest, expenses or monetary damages of any kind (including, without
limitation, court costs, reasonable fees, expense[s] and disbursements of
attorneys and consultants) (collectively ADamages@) asserted against, imposed upon or
incurred by Seller, as a result of claims or lawsuits by third parties, (including
any such claim or lawsuit for personal injury or property damage) where
liability is based solely on a defect in design and/or a defect in the
warnings and instructions provided by Buyer without any negligence on the
part of Seller. 

(emphasis added).  The second
paragraph of section 5.3 requires IFI to indemnify Lycoming for such ADamages@: 

asserted against, imposed upon or
incurred by Buyer [Lycoming], whether or not involving liability to any
third party, resulting from or arising out of any claim, lawsuit . . .
recall, retrofit or government investigation or proceeding against Buyer relating
to performance or defects (including without limitation, manufacturing
defects), or the breach of any express or implied warranty for any Products
manufactured by Seller [IFI] pursuant to this Agreement, except to the
extent that such Damages are directly caused by the negligence of the Buyer.

(emphasis added).

B.        The Assignment and Assumption Agreement Between IFI
and ISW








Before producing any crankshaft
forgings, IFI executed an AAssignment and Assumption Agreement@ (AAssignment Agreement@) in October 1996 to accomplish three
stated purposes.  First, IFI assigned all the assets of its AInterstate Southwest division@ to Interstate Southwest, Ltd. (AISW@).  The assigned assets included the
physical plant in Navasota, Texas where the crankshaft forgings were to be
produced.  According to ISW, IFI=s contract with Lycoming was also
assigned to ISW.  In exchange for its assets, IFI received a 98% partnership
interest in ISW.  IFI did not obtain Lycoming=s consent to the transfer or inform
Lycoming of the arrangement, and Lycoming contends it had no knowledge of the
Assignment Agreement between IFI and ISW until this suit was filed.  

Second, the Assignment Agreement
designated ISW the Atrue and lawful attorney@ for IFI with Afull power of substitution, for
[IFI] . . . in its name and stead or
otherwise. . . .@  It similarly authorized ISW to Aprosecute in the name of [IFI] or
otherwise . . . any and all
proceedings . . . which [ISW] may deem proper in order to
collect, assert or enforce any claim, right or title of any Division Assets,
and do all other acts and things in relation thereto as [ISW] . . .
shall deem desirable . . . .@

Third, the Assignment Agreement
required ISW to indemnify IFI.  Under this provision, ISW Aassumes, holds [IFI] harmless from,
and agrees to pay and satisfy and fulfill, the Division Liabilities.@  ISW further agreed Aabsolutely and unconditionally to
defend, indemnify and hold [IFI] harmless from all claims arising directly or
indirectly from or with respect to the Division Liabilities, against or with
respect to [ISW] or [IFI], or both, and to satisfy and pay same . . . .@

On the same day that it executed this
agreement, IFI assigned its partnership interest in ISW to ISW=s limited partner, a Delaware
corporation known as ISW Texas Corporation.  IFI owns that company.  ISW=s general partner, Texas Steel
Corporation, is wholly owned by Citation Corporation (ACitation@), as is IFI.  Thus, both IFI and ISW
are affiliated with Citation.  Ed Buker, Citation=s Chief Executive Officer, is also
the chairman of both IFI and ISW.

C.        Changes in Specifications and Manufacture








Lycoming received the first shipment
of crankshaft forgings on March 4, 1997.  On  November 16, 1998, Lycoming
issued an engineering change order requiring the vanadium content of the
forgings to be Acontrolled@ to 0.07% to 0.11%.  The change order further provided, AThis material modification ensures a
2nd tempering temperature of 1100o F or higher (at least 100o
F higher than the 1st tempering temperature) for 5 hours to meet the
engineering drawing hardness requirements . . . .@ (capitalization normalized).  

Beginning the following month,
forgings were manufactured in a different furnace that was generally operated
manually rather than by using the temperature controls outside of the furnace.

D.        The
Crankshaft Failures

1.         Failure
to Heat-Treat Forgings

Beginning in 1999, a number of
crankshaft failures occurred.  In some instances, the cause of the failure is
undisputed.  For example, on July 27, 1999, Lycoming notified IFI of an engine
failure due to the forging facility=s failure to heat-treat the
crankshaft forgings.[4] Similar
failures followed.  On May 15, 2000, Lycoming wrote IFI regarding 54 crankshaft
forgings that lacked heat treatment; the consequences of this Aquality escape@ included two in-flight failures.[5] 
Lycoming wrote that IFI Amust recognize [its] liability@ and asked that IFI notify its
insurance carrier of the problem.  Lycoming further opined that the defects
were caused by Ainadequate process controls to ensure proper heat treatment.@  

IFI subsequently reached a settlement
with Lycoming regarding these failures.  As part of this settlement, the
parties agreed to a change in the forging process.  Specifically, Lycoming
accepted IFI=s offer to Abuild press-tooling or hammer-tooling to put the parts on the
press . . . .@[6] 








2.         Subsequent
Crankshaft Failures

Other engine failures occurred for
which the cause was not readily apparent, and Lycoming instructed its employee,
Dr. Yoon Kim, to investigate.  The crankshafts at issue have six crankpins, and
the failures that are the basis of this litigation generally originated below
the outer nitride casing of the crankshaft near or between the fifth and sixth
crankpins.      On June 28, 2000, a Lycoming engine failed after approximately
100 hours of service.  In his report dated July 27, 2000, Dr. Kim concluded
that a connecting rod bearing had failed, and the resulting stresses caused a
subsurface fracture to the crankshaft between the fifth and sixth crankpins. 
On May 31, 2000, a crankshaft failed in a Lycoming engine after 262 hours of
service, but the report on that failure, which occurred in Australia, was not
completed until September 21, 2000.  A surface fracture was observed on this
crankshaft, and this failure was also attributed to a bearing failure.  A third
failure occurred on August 29, 2000.  In his report dated October 25, 2000, Dr.
Kim attributed the surface fracture in front of the sixth crankpin to the
shifting of a bearing.  In each of these three failures, the crankshaft
forgings had been heat-treated. 

IFI was not immediately informed of
the failure of these heat-treated crankshafts.  Although Lycoming met with IFI
on November 29 and 30, 2000 regarding costs for three other failed crankshafts
that had not been heat-treated, Lycoming did not disclose at this time that the
three heat-treated crankshafts described above had also failed. 

E.        The Second Addendum to the MSA 

By this time, the original five-year
MSA had expired, but Lycoming continued to order and receive crankshaft
forgings, ostensibly from IFI.  To renew the MSA, Lycoming and IFI negotiated a
Second Addendum signed by IFI on April 26, 2001 and by Lycoming on July 17,
2001.  ISW is not a signatory to and is not mentioned in the Second Addendum,
which extended the MSA for another five years.








F.        The Crankshaft Failures Continue

After the Second Addendum was
successfully negotiated, Dr. Kim continued to analyze additional failures.  He
completed another failure analysis on July 3, 2001.  This was the first
instance in which Dr. Kim concluded that a crankshaft failed due to subsurface
fatigue from abnormally high stresses of unknown cause.

On October 19, 2001, Dr. Kim wrote to
IFI that a crankshaft had failed after 886.8 hours of service.  According to
Dr. Kim, the failed crankshaft included 0.08% vanadium and contained a
microscopic Ahoneycomb@ structure.  Concerning this structure, Dr. Kim wrote: 

We do not know the cause of its
formation nor its effect on the mechanical properties[,] especially on the
fatigue property.  You can do whatever you want to do with the impact test
sample to determine the cause of the honeycomb structures.  Please let me know
your findings as soon as possible.

On December 11, 2001, Lycoming and
IFI personnel met concerning ten crankshaft failures.  Two days later, Lycoming
prepared an engineering order requiring vanadium to be limited to .01% and the
second heat tempering to be conducted at temperatures not exceeding 1150 o
F.  

Lycoming had previously consulted an
outside engineering firm regarding the failure of the heat-treated crankshafts,
and on December 19, 2001, James M. Hilts of Kingsway Engineering Services
completed his report to Lycoming.  Hilts wrote that Athe metallagraphical [sic] evidence
indicates that the crack could have started as an elliptical[-] shaped
(football) inclusion roughly 0.005 x 0.01 inches lying 0.011 inches below the
0.026[-] inch thick nitride case.@  Although Hilts tested material that
was Anot the exact form, strength or heat
treatment as the failed material[,]@ he concluded that A[i]f the maximum cyclic stresses are
truly in the range of 33 to 54 ksi[,][[7]] no surface
crack would have initiated on the surface@ of the crankshaft.  Thus, he
reasoned, A[i]nitiation of a surface crack would require stresses well over 70
ksi[;] [t]herefore, there must have been a pre-existing defect.@ 








Lycoming then began to recall
crankshafts that were already in service.  On February 1, 2002, Lycoming issued
a mandatory service bulletin recalling crankshafts manufactured under the MSA
that were used in Lycoming=s six-cylinder turbocharged engines.  Ten days later, the
Federal Aviation Administration (AFAA@) issued a similar Airworthiness
Directive concerning all Lycoming turbocharged TIO-540 and LTIO-540 engines of
300 hp or higher that were manufactured from March 1997 to February 2002.

Lycoming provided an update to IFI on
February 19, 2002, informing it of seven confirmed and six unconfirmed
crankshaft failures.[8]  In this
letter, Brock A. Spigelmyer, Design Engineer for  Lycoming, wrote that Lycoming=s Ainvestigation has been focusing
primarily on the presence of honeycomb-like features found on the fracture
surfaces@ because A[t]he investigation has ruled out the
possibility of any dimensional or machining[-]related problems and the design
itself has been substantiated by 20 or more years of reliable service.@ 

G.        The Release and Indemnity Agreement and the
Replacement Crankshaft Agreement 

Additional recalls followed in August
and September 2002.  Lycoming attempted to negotiate an agreement under which
IFI would produce replacement crankshafts, but IFI refused to do so unless
Lycoming agreed to indemnify it for past and future crankshaft failures.  Thus,
Lycoming entered into the following pair of agreements on October 14, 2002, to
address the need for replacement crankshafts.  These are the only agreements in
the record between Lycoming and ISW concerning the production of crankshaft
forgings.

1.         The Release








In the Release and Indemnity
Agreement (the ARelease@), Lycoming, Citation, IFI, and ISW agreed that Athe Parties have a dispute concerning
whether [IFI] is required to produce the Replacement Crankshafts pursuant to
the terms of the [MSA] made as of May 4, 1995, as amended, and are entering
into this [Release] without prejudice to their respective positions on that
issue . . . .@[9]  They further agreed that: 

[The Release] will not amend, alter,
or modify the terms of the MSA, except to the extent specifically set forth in
this [Release], reserving to ISW, [IFI], and Citation their contention that the
MSA is invalid and reserving to . . . Lycoming [its]
opposition to that contention and [its] damage claims, if any, except as
limited by this [Release].  

Under the terms of the Release, ISW
agreed to produce replacement crankshafts subject to a Replacement Crankshaft
Production Agreement (AReplacement Crankshaft Agreement@) attached as an exhibit to the
Release and incorporated by reference.  Lycoming released and agreed to
indemnify IFI, ISW, and Citation for costs, losses, and damages these entities
incurred Aas a result of claims or lawsuits of any kind by any third party or
[Lycoming] relating to the Replacement Crankshafts.@

2.         The Replacement Crankshaft Agreement

In the Replacement Crankshaft
Agreement, Lycoming and ISW acknowledged the contemporaneous execution of the
Release and agreed that: 

[T]his [Replacement] Agreement is
separate from, and not governed by, the [MSA] between the parties, and [the
parties] have further agreed that this [Replacement] Agreement will not amend,
alter, or modify the terms of the MSA, except to the extent specifically set
forth in this [Replacement] Agreement, reserving to ISW its contention that the
MSA is invalid and reserving to Lycoming its opposition to that contention and
its damage claims, if any, except as limited by this [Replacement] Agreement
and the attached Release . . . .  

Neither the Release nor the
Replacement Crankshaft Agreement mentions any assignment of rights or assets,
delegation of duties, or the existence of an attorney-in-fact relationship
between IFI and ISW.  








Although the record does not reveal
any failures of crankshafts produced pursuant to the Replacement Crankshaft
Agreement, liability for failures of crankshafts produced pursuant to the MSA
and its Addenda remained unresolved.  For example, less than a week before the
Release and Replacement Crankshaft Agreements were executed, Lycoming and IFI
were sued in federal court for damages arising from one or more of the failures
of crankshafts produced pursuant to the MSA and its Addenda (the AFlying Frog litigation@);[10]
executives of IFI and ISW were concerned that Lycoming would seek
indemnification for its own losses as well as for damages to third parties. 
Eventually, both ISW and Lycoming attempted to resolve the indemnification
question by bringing suit in their respective home states.

H.        The Texas Suit

ISW filed the instant lawsuit in
Grimes County on April 23, 2003, asserting causes of action for
(1) business disparagement, (2) breach of contract based in part on
Lycoming=s failure to inform ISW earlier of
the crankshaft failures, (3) contractual contribution and indemnity under
section 5.3 of the MSA, (4) declaratory judgment concerning the indemnity
provisions of the MSA, and (5) attorneys= fees and costs pursuant to Section
37.009 of the Texas Civil Practice and Remedies Code.  ISW asked the trial
court to hold that the paragraph of the MSA regarding IFI=s duty to indemnify Lycoming was
unenforceable because it was against public policy and a contract of adhesion. 
At the same time, ISW asked the trial court to declare that ISW was entitled to
contractual indemnification from Lycoming under the MSA.  Although ISW
incorporated the MSA and its addenda by reference in its original petition, the
pleading contained no allegations that IFI had assigned the MSA to ISW or that
ISW was acting in a representative capacity.[11]








I.          The
Pennsylvania Lawsuits

The day before it answered this suit,
Lycoming sued IFI and CitationCbut not ISWCin a Pennsylvania state court on May 22, 2003.  In that suit,
Lycoming sought indemnification for its losses arising from the crankshaft
failures.  In a separate Pennsylvania lawsuit, Lycoming agreed with IFI and
Citation to the entry of an Agreed Order for Preliminary Injunction on June 12,
2003.  The injunction required IFI and Citation to Aproduce and provide all crankshaft
forgings ordered by [Lycoming] pursuant to the [MSA].@  Although the Texas trial court
granted ISW a temporary anti-suit injunction to prevent Lycoming from
prosecuting the Pennsylvania actions, this court reversed the trial court=s order and dissolved the
injunction.  AVCO Corp. v. Interstate Sw., Ltd., 145 S.W.3d 257, 260
(Tex. App.CHouston [14th Dist.] 2004, no pet.). 

J.         The Texas Causes of Action

On June 26, 2003, ISW filed its First
Amended Original Petition in this case.  This petition contains ISW=s first mention of the Assignment
Agreement.  The pleadings were amended several more times, and the case was eventually
tried on ISW=s Sixth Amended Original Petition, filed June 1, 2004, and its First
Trial Amendment, filed February 7, 2005.  In its live pleadings, ISW alleges
that Lycoming concealed the crankshaft failures from IFI and ISW, but privately
attributed the failures to deficiencies in the forging process.  According to
ISW, ALycoming and IFI, with the full
knowledge and consent of ISW (and on behalf of ISW) executed the Second Addendum
to the MSA in the early summer of 2001@ and at that time, Lycoming
(1) had no intention of performing under the MSA; (2) knew the
crankshafts were under-designed, and knew that IFI and ISW did not know this; and
(3) knew that IFI and ISW had no knowledge of the additional crankshaft
failures.  








ISW also asserted causes of action
for fraud, fraudulent inducement of the MSA and Second Addendum, violation of
Section 2.306 of the Texas Business and Commerce Code, and breach of contract. 
In addition, ISW sought rescission of the MSA and its Addenda and asked the
trial court to return the parties Ato the position they were in prior to
the MSA and its Addenda.@  ISW also sought the declaratory relief discussed below.

1.         Declaratory
Judgment Regarding the Assignment and Standing

In its first request for declaratory
judgment, ISW asked the trial court to declare that:  (a) the Assignment
Agreement validly transferred and assigned to ISW the MSA and all rights and
obligations thereunder; (b) ISW assumed and was assigned the liabilities
and obligations of IFI concerning the MSA; (c) the Assignment Agreement
irrevocably appointed ISW as IFI=s attorney-in-fact, thereby assigning
to ISW the right to prosecute and defend litigation concerning the MSA;
(d) because IFI assigned the MSA to ISW, ISW had standing to assert the
claims in this suit; (e) ISW was the real party in interest in this
litigation and had a personal stake in its outcome; (f) ISW was authorized
to assert the claims in this lawsuit in its own right as well as on behalf of
IFI; and (g) ISW had standing because it produced all the crankshafts.

2.         Declaratory
Judgment Regarding the MSA








Under the heading of ADeclaratory JudgmentCMSA,@ ISW asked the trial court to issue a
declaratory judgment that (a) the crankshaft failures and the resulting
lawsuits, settlements, groundings, and recall, including all resulting damages
for losses suffered by Lycoming, were directly caused by Lycoming=s negligence; (b) the failures
were not caused by the acts or omissions of ISW or IFI; (c) the failures
were not caused by performance or defects or the breach of any express or
implied warranty of any forgings produced under the MSA; (d) the failures
did not relate to Athe seller=s performance@ under the MSA or defects of the crankshaft forgings;
(e) Lycoming failed to comply with the notice provisions of the MSA, and
this material breach resulted in the MSA=s termination; (f)  because it
failed to follow the MSA=s express terms, Lycoming could not enforce the indemnity
provisions of the MSA; (g) the agreement to indemnify Lycoming under the
MSA was unenforceable as a matter of law, was against public policy, and was a
contract of adhesion; and (h) the indemnity agreement was limited to the
negligence, if any, Aof the seller under the MSA in relation to the forging
process and does not cover@ the negligent acts or omissions of Lycoming or other parties
under Lycoming=s control.

3.         Trial
Amendment

Finally, ISW filed a trial amendment
asserting claims for exemplary damages and alleged that, because Lycoming
secured the execution of the Second Addendum by deception, the statutory
limitation on exemplary damages did not apply.[12]

K.        Pre-Trial and Trial Rulings

Lycoming
challenged ISW=s standing and capacity to bring its claims, and the trial court granted
partial summary judgment, holding that ISW had both standing and capacity. 
Lycoming does not challenge the partial summary judgment on appeal.  








The case was tried between December
6, 2004 and February 15, 2005.  Before trial, Lycoming filed a unilateral Astipulation@ that it was not seeking
indemnification from ISW, but ISW opposed the stipulation.  After the start of
trial, the court struck the stipulation and refused to allow Lycoming to inform
the jury that such a stipulation had been offered.  The trial court also
excluded documents and testimony offered to show that a division of the FAA
attributed the crankshaft failures to overheating.[13] 
In addition, the trial court excluded evidence that the data Lycoming collected
as part of its own root cause investigation of the crankshaft failures included
information that overheating of forgings caused similar failures in the engines
of a competitor.  Lycoming challenges each of these rulings on appeal. 
Lycoming also contends the trial court erred in refusing to give certain jury
instructions concerning punitive damages, and complains of the trial court=s failure to sustain Lycoming=s objections to portions of ISW=s closing arguments on the grounds of
relevance and improper argument.

L.        The
Directed Verdict

After ISW completed its
case-in-chief, Lycoming successfully moved for a partial directed verdict on
several of ISW=s claims.  ISW appeals the trial court=s dismissal with prejudice of ISW=s claims under section 2.306 of the
Business and Commerce Code.  

M.       Jury=s Findings

Over Lycoming=s objection, the trial court refused
to submit separate jury questions concerning IFI and ISW but instead submitted
jury questions regarding Lycoming=s conduct to AInterstate@ and damages AInterstate@ incurred.  In the charge, AInterstate@ was defined to include both ISW and
IFI.  The trial court further instructed the jury Athat the court has determined as a
matter of law that [ISW] may bring its claims and the claims of [IFI] against
Lycoming, including claims against Lycoming relating to the MSA.@  The MSA was defined to include both
Addenda.

By a vote of ten to two, the jury
found that ALycoming fraudulently induce[d] the extension of the MSA through the
Second Addendum to the MSA@ and Acommit[ted] fraud on Interstate[.]@  The jury was then asked to find the
sum of money that would compensate AInterstate@ for damages proximately caused by
either act, and was told to limit its finding to two specific categories of
damages.  First, the jury was asked for A[t]he increase in aviation products
liability insurance premiums sustained in the past@; it assessed this amount at $1.7
million.  Second, the jury was asked to find the A[r]easonable and necessary expert
expenses incurred in the investigation of the crankshaft failures@; it assessed this amount at
$2,715,623.17.








The jury also found by clear and
convincing evidence that Athe harm to Interstate resulted from fraud or malice@[14] and Afrom a specific intent by Lycoming to
cause substantial injury to Interstate[.]@ In addition, the jury found that
Lycoming secured the execution of the Second Addendum to the MSA by deception,
and determined that the reasonable fees for the necessary services of AInterstate=s@ attorneys was $4,760,027.80 for
preparation and trial, $350,000 for an appeal to a court of appeals, $30,000
for filing or responding to a petition for review in the Texas Supreme Court,
and $170,000 for briefing and argument on the merits in the Texas Supreme
Court.  The jury further found that a defect in Lycoming=s crankshaft design was the sole
cause of the failures.

In separate instructions, the jury
was asked to determine the amount that should be assessed against Lycoming and
awarded to AInterstate@ as exemplary damages.  The trial court overruled Lycoming=s objections that the charge for
exemplary damages was incomplete and insufficient under the Texas and United
States constitutions, and the jury unanimously assessed punitive damages at
$86,394,763.  

N.        The Judgment

After the jury returned its verdict,
ISW submitted a proposed judgment, and the trial court signed the judgment
without any change.  The court rendered judgment for ISW Afor the claims asserted on its own
behalf as well as those claims asserted on behalf of [IFI]@ in the amounts found by the jury,
together with court costs, interest, and contingent awards of attorneys= fees for various appeals.  In
connection with the jury=s findings, the trial court:

1.         Rescinded Athe indemnification provision of Section 5.3 of the [MSA] and its
Addenda, which requires the Seller to indemnify the Buyer@ due to Athe
jury=s finding of fraud and fraudulent
inducement . . . .@
The trial court further held that as a result of the rescission, this provision
Acannot be enforced against [ISW], [IFI], or their
successors and assigns@;








2.         Held Athat
the jury=s findings entitle [ISW] to recover the entire amount
of exemplary damages awarded by the jury even if it is later found that only
nominal actual damages were recoverable@; 

 

3.         Concluded that, due to the jury=s findings, the exemplary damages awarded are not
subject to a statutory damage cap;[15] and

 

4.         Found
that, based on the jury=s factual findings, the award of attorneys= fees and costs are equitable and
just as those terms are used in Section 37.009 of the Texas Civil Practice and
Remedies Code.[16]

O.        Declaratory Relief

The trial court=s rulings concerning ISW=s requests for declaratory relief are
contained in six numbered paragraphs, which we refer to as Declaratory
Judgments 1B6:

1.         The Bill of Sale and Assignment Assumption
Agreement (AAssignment Agreement@) validly assigned the [MSA] to [ISW]; the Assignment Agreement
irrevocably appointed [ISW] as [IFI=s]
attorney-in-fact, with full power to, among other things, initiate legal
proceedings in the name of [ISW] or [IFI], and to collect, assert, or enforce
any claim or right in connection with any transferred asset, including the
[MSA] with [Lycoming], thereby assigning to [ISW], the right to prosecute and
defend litigation related to the [MSA] and [IFI];  [ISW] has standing to
prosecute and defend claims related to the [MSA]; and [ISW] is authorized to
assert the claims in this lawsuit, in its own right as well as on behalf of
[IFI].

 

2.         A defect in [Lycoming]=s design of the crankshafts was the sole cause of the
crankshaft failures and the resulting service bulletins, airworthiness
directives, crankshaft recall and grounding of aircraft with Lycoming engines;

 








3.         Because a defect in [Lycoming=s] design of the crankshafts was the sole cause of the
crankshaft failures and the resulting service bulletins, airworthiness
directives, crankshaft recall and grounding of aircraft with Lycoming engines,
[Lycoming] cannot recover, in whole or in part, any losses, liabilities,
claims, costs, demands, judgments, penalties, fines, interest, expense or
monetary damages of any kind, (including court costs, reasonable fees, expenses
and disbursements to attorneys and consultants) (collectively ADAMAGES@)
that have been, or may be, asserted against, imposed upon, incurred, or
suffered by [Lycoming] as a result of any claim or lawsuit (including claims
and lawsuits for personal injury and property damage), recall, retrofit, grounding,
or government investigation relating in any way to, or arising out of, the
crankshaft failures and the resulting service bulletins, airworthiness
directives, crankshaft recall and grounding of aircraft with Lycoming engines
from [ISW] and/or [IFI] and/or their successors or assigns under the [MSA] or
its Addenda, Section 5.3 of the [MSA], or any other legal theory that would
impose liability on [ISW] and/or [IFI] and/or their successors or assigns,
regardless of whether [Lycoming] asserts the right to recover such DAMAGES, if
any, under the common law, case law, statute, rule or otherwise, including but
not limited to claims for contribution, implied or express indemnity,
negligence, strict liability or breach of any express or implied contract or warranty
. . . .

 

Using the same broad language, the
trial court stated in Declaratory Judgment 4 that, because a design defect was
the sole cause of the crankshaft failures, the failures and the consequences of
the failures Awere not related to or caused by [ISW] and/or [IFI], including any act
and/or omission in the forging process and/or the overheating of the steel in
the forging process (regardless of whether such act and/or omission constitutes
negligence),@ and thus, Lycoming could not recover damages under any legal theory.  In
Declaratory Judgment 5, which also was predicated on the finding that a design
defect was the sole cause of the failures, the trial court declared that:








[The failures] were not related to or caused by: 
(1) [ISW]=s and/or [IFI]=s
and/or the Seller=s performance of the MSA or its Addenda; (2) the
performance of the crankshaft forgings provided under the MSA or its
Addenda . . . ; (3) defects (including manufacturing
defects) in the crankshafts and crankshaft forgings manufactured or provided to
[Lycoming] under the MSA or its Addenda; or (4) [ISW]=s and/or [IFI]=s
and/or the Seller=s breach of any express or implied warranty for any
crankshafts or crankshaft forgings manufactured or provided to [Lycoming] under
the MSA or its Addenda . . . .  

The trial court again concluded that
Lycoming could not recover any damages from IFI or ISW under any legal theory. 


In Declaratory Judgment 6, the trial
court declared that the indemnification provision in the second paragraph of
Section 5.3 of the MSA Ais unenforceable as a matter of law because it does not meet
the legal requirements for indemnification agreements under Texas or
Pennsylvania law . . . .@

This appeal timely ensued.

II.  Issues Presented

In a total of twenty-seven issues,
Lycoming challenges ISW=s standing and the legal sufficiency of the evidence
supporting the judgment in virtually all respects.[17] 
Lycoming also challenges the attorneys= fees award; contends the actual
damages are not legally cognizable; and alleges that the punitive damage award
exceeds constitutional bounds.  Finally, Lycoming asserts various evidentiary
and jury charge errors.  In two cross-points, ISW challenges the directed
verdict on its claim for breach of contract.  We address only those issues that
are dispositive of this appeal.  Tex. R.
App. P. 47.1.

III.  Standing








Before reaching the merits of this
appeal, we must address issues of standing.  In its first issue, Lycoming
contends that ISW lacks standing to assert any of the claims at issue
because ISW is not a party to the MSA or its Addenda.  In its third issue,
Lycoming argues that ISW lacks standing to sue Lycoming on its own behalf
because Lycoming offered a formal stipulation before trial that it had never
and would never seek indemnification from ISW for the crankshaft failures. 
Lycoming similarly argues in its sixteenth issue[18]
that ISW lacks standing to pursue its claims for declaratory relief because the
offered stipulation eliminated any dispute or basis for granting ISW relief. 

A.        Governing
Law

A party=s standing to pursue a cause of
action is a question of law we review de novo.  Mayhew v. Town of Sunnyvale,
964 S.W.2d 922, 928 (Tex. 1998); Emmett Props., Inc. v. Halliburton
Energy Servs., Inc., 167 S.W.3d 365, 371 (Tex. App.CHouston [14th Dist.] 2005, pet.
denied).  The general test for standing in Texas requires that there be a real
controversy between the parties that will be actually determined by the
judicial declaration sought.  Tex. Ass=n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993). 
Specifically, a plaintiff has standing to sue if: (1) the plaintiff has
sustained, or is immediately in danger of sustaining, some direct injury as a
result of a complained-of wrongful act; (2) there is a direct relationship
between the alleged injury and the claim asserted; (3) the plaintiff has a
personal stake in the controversy; (4) the challenged action has caused
the plaintiff some injury in fact; or (5) the plaintiff is an appropriate party
to assert both its own interest and the public interest in the matter.  El
Paso Cmty. Partners v. B & G/Sunrise Joint Venture, 24 S.W.3d 620, 624
(Tex. App.CAustin 2000, no pet.).  








Generally,  the pleader must allege
facts that affirmatively demonstrate the court=s jurisdiction to hear the case. In
re Forlenza, 140 S.W.3d 373, 376 (Tex. 2004) (orig. proceeding).  The
alleged injury must be concrete, particularized, fairly traceable to the
defendant=s allegedly unlawful conduct, and likely to be redressed by the requested
relief.  Brown v. Todd, 53 S.W.3d 297, 305 (Tex. 2001).  In reviewing
the trial court=s ruling on the issue of standing, we construe the pleadings
in the plaintiff=s favor and consider the pleader=s intent.  County of Cameron v.
Brown, 80 S.W.3d 549, 555 (Tex. 2002).  In addition, courts Amay consider evidence and must do so
when necessary to resolve the jurisdictional issues raised.@  Bland Indep. Sch. Dist. v. Blue,
34 S.W.3d 547, 555 (Tex. 2000). 

Standing is not to be confused with
capacity.  AA plaintiff has standing when it is personally aggrieved,
regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to
act, regardless of whether it has a justiciable interest in the controversy.@  Nootsie, Ltd. v. Williamson
County Appraisal Dist., 925 S.W.2d 659, 661 (Tex. 1996).  Capacity concerns
Aa party=s personal right to come into court,@ while standing concerns Athe question of whether a party has
an enforceable right or interest.@  Austin Nursing Ctr., Inc. v.
Lovato, 171 S.W.3d 845, 849 (Tex. 2005) (quoting 6A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal
Practice and Procedure: Civil 2d ' 1559, at 441 (2d ed. 1990)). 
Thus, a plaintiff with no legally cognizable interest in the outcome of the
case lacks standing to sue on its own behalf, but may be authorized to sue on
behalf of another.  See Nootsie, 925 S.W.2d at 661; see also Neeley
v. W. Orange-Cove Consol. Indep. Sch. Dist., 176 S.W.3d 746, 776 (Tex.
2005) (A[A] party=s standing to assert a claim does not
depend on its ability or willingness to look out for interests other than its
own.@). 

B.        Pleadings at Issue








Because our analysis of standing
begins with the plaintiff=s pleadings,  we must first address Lycoming=s argument concerning which
pleadings are determinative.  In its fourteenth issue, Lycoming argues that the
Texas trial court should have refused to exercise jurisdiction over ISW=s amended claim for declaratory
judgment interpreting the MSA and its Addenda because, by the time the amended
petition was filed, ISW=s requests for declaratory relief addressed claims that were
already pending in the Pennsylvania actions.[19] 
In substance, Lycoming asks us to treat the Pennsylvania actions as Afirst-filed@ suits with regard to ISW=s requests for declaratory judgments.


Here, ISW originally filed suit first
for breach of contract, contribution, contractual indemnity, and declaratory
judgment regarding the MSA.[20]  The
original petition incorporated the MSA and its Addenda by reference, but as
Lycoming correctly points out, ISW is not a party to these agreements.  This is
shown by the documents themselves, and because these documents are incorporated
by reference in the petition, the face of the pleading shows that ISW is not a
party to these agreements.  See Cockrell v. Estevez, 737 S.W.2d 138, 141
(Tex. App.CSan Antonio 1987, no writ) (AWhen an inspection of an exhibit
referred to in the pleadings shows facts contradictory to the pleadings, the
exhibit, not the allegation of the pleadings, must control.@).  Moreover, the documents show that
IFI=s duties under the contract cannot be
delegated to ISW without Lycoming=s prior written consent, and ISW did
not initially allege that such consent had been obtained or waived.  

As noted, before ISW amended its
petition, Lycoming had filed its Pennsylvania lawsuits.  Lycoming therefore
argued that ISW lacked standing to prosecute its declaratory judgment claims
because, inter alia, those claims were primarily defenses to Lycoming=s Pennsylvania claims.  On appeal,
Lycoming supports this argument with a statement made by this court when the
case was last before us:








Regarding choice of forum, Texas
courts generally favor the plaintiff=s choice when deciding intrastate
venue questions.  However, the mere fact that a plaintiff chose a Texas forum
and the defendant subsequently filed a mirror image suit in a sister state does
not by itself support issuance of an anti-suit injunction; both suits may
continue unabated.  Additionally, in the present case, many of ISW=s claims are defensive in
nature, seeking declaratory judgment that would defeat Lycoming=s affirmative claims. The nature of
ISW=s claims weighs against a general
policy favoring a Texas venue.

AVCO, 145 S.W.3d at 266 (citations
omitted).  Lycoming relies on the quoted language and on cases holding that  A[t]he Declaratory Judgments Act is >not available to settle disputes
already pending before a court.=@  BHP Petroleum Co., Inc. v.
Millard, 800 S.W.2d 838, 841 (Tex. 1990) (quoting Heritage Life Ins. Co.
v. Heritage Group Holding Corp., 751 S.W.2d 229, 235 (Tex. App.CDallas 1988, writ denied); see
also Abor v. Black, 695 S.W.2d 564, 566 (Tex. 1985) (stating that the trial
court should not exercise jurisdiction over a suit for declaration of
non-liability by a potential negligence defendant); Space Master Int=l, Inc. v. Porta-Kamp Mfg. Co., Inc., 794 S.W.2d 944, 948 (Tex. App.CHouston [1st Dist.] 1990, no writ)
(noting that a trial court may properly dismiss a suit for declaratory judgment
when the court=s exercise of jurisdiction would Adeprive the plaintiff of the ability
to select the appropriate forum@ to hear the case); Mission Ins. Co. v. Puritan Fashions
Corp., 706 F.2d 599, 602 n.3 (5th Cir. 1983) (AAnticipatory suits are disfavored
because they are an aspect of forum-shopping.@). 








Assuming that a plaintiff=s request for defensive declaratory
relief raises questions of standing,[21] this
argument does not apply here.  Unlike the parties in the cases on which
Lycoming relies, the parties are not the same in the various lawsuits at issue
here.  Cf. Hawkins v. Tex. Oil & Gas Corp., 724 S.W.2d 878,
891 (Tex. App.CWaco 1987, writ ref=d n.r.e.) (stating that a trial court should refuse to
entertain a declaratory judgment action if another action is pending involving
the same parties and in which the same issues may be adjudicated).  Moreover, ISW=s claims for declaratory judgment
were not pending in another court when the Texas suit was filed;  ISW filed
this lawsuit before Lycoming sued IFI and Citation in Pennsylvania, and when
Lycoming challenged ISW=s standing, ISW amended its pleadings to assert additional
jurisdictional facts.  Lycoming did not specially except, object, or move to
strike the amended pleading, which effectively relates back and replaces the
original pleadings of ISW=s first-filed suit.  See Tex. R. Civ. P. 65 (a substituted pleading takes the place of
the prior pleading); Brown, 80 S.W.3d at 555 (stating that if the
petition does not affirmatively demonstrate incurable defects in jurisdiction,
the issue is one of pleading sufficiency and the plaintiff should be afforded
the opportunity to amend); Tex. Ass=n of Bus., 852 S.W.2d at 446 (noting that
litigant can amend pleadings to allege facts conferring standing); see also
Lovato, 171 S.W.3d at 852 (post-limitations substitution of a plaintiff
asserting the same cause of action in a different capacity relates back).[22] 


We therefore overrule Lycoming=s fourteenth issue, and we determine
whether ISW has standing to pursue the adjudicated claims asserted in its Sixth
Amended Original Petition and First Trial Amendment. 

C.        ISW=s Claims Considered Separately from
IFI=s Claims      








In considering ISW=s claims, we are mindful that a
plaintiff may have standing to litigate some of the claims raised but lack
standing to litigate others.  See Crown Life Ins. Co. v. Casteel, 22
S.W.3d 378, 392 (Tex. 2000) (holding that the plaintiff had standing to
litigate all of his asserted claims with the exception of claims requiring
consumer status); Mazon Assocs., Inc. v. Comerica Bank, Tex., 195
S.W.3d 800, 803 (Tex. App.CDallas 2006, no pet.) (AThe determination of whether a
plaintiff possesses standing to assert a particular claim depends on the facts
pleaded and the cause of action asserted.@ (quoting Everett v. TK-Taito,
L.L.C., 178 S.W.3d 844, 853 (Tex. App.CFort Worth 2005, no pet.)).  We are
required to dismiss only those claims over which we lack jurisdiction.  Thomas
v. Long, 207 S.W.3d 334, 338B39 (Tex. 2006).  Thus, we consider
the adjudicated claims separately to determine whether ISW possessed standing
for each.  See Casteel, 22 S.W.3d at 392; SCI Tex. Funeral Servs.,
Inc. v. Hijar, 214 S.W.3d 148, 153 (Tex. App.CEl Paso 2007, pet. denied) (op. on
reh=g) (AWhen standing is placed at issue, the
question is whether the person whose standing is challenged is a proper party
to request an adjudication of a particular issue and not whether the
issue itself is justiciable.@) (emphasis added) (citing Flast v. Cohen, 392 U.S. 83, 99B100, 88 S. Ct. 1942, 1952, 20 L. Ed.
2d 947 (1968)).

D.        Extent
of Standing

1.         Declaratory Judgment

Lycoming correctly points out in its
first issue that ISW is not a party to the MSA or its Addenda, and argues that ISW
therefore lacks standing to seek declaratory judgment regarding these
agreements.  We disagree.  Reviewing the jurisdictional evidence de novo, we
note that the first paragraph of section 5.3 of the MSA provides that Lycoming
must indemnify IFI and IFI=s affiliates and hold them harmless from losses and costs
incurred by IFI in certain circumstances.  Here, ISW is an affiliate of IFI and
a potential indemnitee under the terms of the MSA.  See Dresser Indus., Inc.
v. Page Petroleum, Inc., 853 S.W.2d 505, 508 (Tex. 1993) (stating that an
indemnity agreement Acreates a potential cause of action in the indemnitee against
the indemnitor@).  In addition, the Assignment Agreement requires ISW to indemnify IFI,
and Lycoming has requested indemnity from IFI.  Thus, ISW has a justiciable
interest in determining the validity and effect of the indemnity provisions of
the MSA.  See Tex. Civ. Prac.
& Rem. Code Ann. ' 37.004 (Vernon Supp. 2007) (a person Ainterested@ under a written contract or whose
rights are affected by a contract may have questions of contract construction
or validity determined by the court); cf. Victoria Bank & Trust Co. v.
Brady, 811 S.W.2d 931, 939B40 (Tex. 1991) (A>[A] party to or interested in a
contract may, by legal proceedings or otherwise in good faith, interfere with
the execution of the contract where there is a bona fide doubt as to his rights
under it.=@ (quoting Hardin v. Majors, 246 S.W. 100, 102 (Tex.
Civ. App.CAmarillo 1922, no writ))). 








We conclude that, as IFI=s affiliate and potential indemnitor
and as Lycoming=s potential indemnitee, ISW has standing to seek declaratory
relief on behalf of both IFI and ISW.  Our analysis is not affected by Lycoming=s argument that it eliminated the
justiciable controversy between the partiesCand thus, ISW=s standingCby offering to stipulate that
Lycoming would not seek indemnification from ISW.  Because ISW=s asserted claims are not dependent
on allegations that Lycoming may seek indemnification directly from ISW, its
standing is not affected by Lycoming=s proposed unilateral stipulation.[23] 
We therefore overrule Lycoming=s sixteenth issue, and we overrule its first and third and issues
as they pertain to ISW=s requests for declaratory judgment.

2.         Tort Claims

a.         Claims
Asserted on Behalf of IFI








In its pleadings, ISW alleges, inter
alia, that it asserts IFI=s claims as IFI=s attorney-in-fact pursuant to the
Assignment Agreement.  Lycoming argues that ISW fails to satisfy the conditions
under which an agent has standing to maintain a suit in its own name.  However,
the cases on which Lycoming relies are distinguishable in that the agents in
those proceedings prosecuted or defended actions solely in their own names but
not on behalf of the principal.  See, e.g., Perry v. Breland, 16
S.W.3d 182, 187 (Tex. App.CEastland 2000, pet. denied) (car dealer=s agent brought suit in his own name;
no indication he sued on behalf of dealer); Wilson County Peanut Co. v. Hahn,
364 S.W.2d 468, 470 (Tex. App.CSan Antonio 1963, no writ) (holding that seed purchaser
lacked standing to sue seller=s agent); Tinsley v. Dowell, 87 Tex. 23, 27B28, 26 S.W. 946, 948 (1894) (holding
that real estate agent who brought suit in his own name lacked standing to sue
land purchaser who failed to complete transaction); see also Emmett Props.,
Inc., 167 S.W.3d at 371 (holding that intervening stockholders did not have
an independent right to bring action for damage to corporation=s property and noting that
stockholders did not intervene on behalf of the corporation); cf. Wilkinson
v. Wilkinson, 956 S.W.2d 821, 822B23 (Tex. App.CHouston [1st Dist.] 1997) (holding
that mother who did not bring suit as next friend had standing to assert minor
son=s right to an accounting because she
pleaded her status as managing conservator), op. withdrawn on reh=g, No. 01-96-00219-CV, 1998 WL 175885 (Tex. App.CHouston [1st Dist.] April 2, 1998, no
pet.) (prior opinion rendered moot when minor son reached the age of
eighteen).  Here, ISW specifically pleaded that it asserted claims on IFI=s behalf, and Lycoming does not
dispute that IFI has a justiciable interest in these claims. 

In addition, the Assignment Agreement
authorizes ISW to bring suit in its own name to assert certain claims on IFI=s behalf.  The scope of that
authority is a question of capacity,[24] and no
challenge to ISW=s capacity is before the court on appeal. 

We therefore agree with ISW that it
has standing as IFI=s attorney-in-fact to litigate IFI=s tort claims.[25] 
We conclude that ISW has standing to assert IFI=s tort claims as IFI=s putative attorney-in-fact; thus, we
do not reach the remaining bases for ISW=s standing to assert IFI=s tort claims. 

b.         Claims Asserted on Behalf of ISW

Lycoming also contends that ISW lacks
standing to assert its own claims of fraud and fraudulent inducement because
ISW is neither a party nor a third-party beneficiary to the Second Addendum,
and therefore cannot be the party defrauded.[26] 
In support of this argument, Lycoming relies in part on Nobles v. Marcus,
in which the Texas Supreme Court stated:








It is a fundamental rule of law that
only the person whose primary legal right has been breached may seek redress
for an injury . . . . Without breach of a legal right
belonging to the plaintiff[,] no cause of action can accrue to his
benefit . . . . A party who was not defrauded by the
conveyance has not suffered an invasion of a legal right and therefore does not
have standing to bring suit based on that fraud.

533 S.W.2d 923, 927 (Tex. 1976). 
Here, however, ISW alleges in its live pleadings that AIFI and ISW provided Lycoming with
direct and constructive notice@ that IFI had transferred the MSA and the forging facilities
to ISW.  ISW further alleges that IFI executed the Second Addendum on ISW=s behalf.  After construing the
pleadings liberally and considering the pleader=s intent, we conclude that ISW has
alleged sufficient facts to confer standing to assert its claims of fraud and fraudulent
inducement. 

Finally, Lycoming asserts that ISW
lacks standing because neither ISW nor IFI suffered actual injury as a result
of the fraudulent conduct alleged.  But causation and damage are matters of
proof, and the determination of standing does not require a plaintiff to Aput on its case@ simply to establish jurisdiction.  See
Bland Indep. Sch. Dist., 34 S.W.3d at 554.  In determining standing, Aa court may not weigh the claims= merits but must consider only the
plaintiffs= pleadings and the evidence pertinent to the jurisdictional inquiry.@  Brown, 80 S.W.3d at 555. 
Consideration of causation and damages goes beyond the jurisdictional inquiry
and into the merits of the claims; but if a party lacks standing to assert a
claim, the trial court has no jurisdiction over the merits, and the cause of
action must be dismissed, leaving the merits undecided.  Bell v. Moores,
832 S.W.2d 749, 753B54 (Tex. App.CHouston [14th Dist.] 1992, writ denied). 








Because review of such matters would
require consideration of evidence discussed infra that Agoes to the heart of the merits,@ we recognize ISW=s standing to pursue its claims to
judgment.  See CHCA E. Houston, L.P. v. Henderson, 99 S.W.3d 630, 633B34 (Tex. App.CHouston [14th Dist.] 2003, no pet.)
(finding standing for a putative successor-in-interest to assert a claim for
breach of contract because Adeciding who should pay whom on a contract goes to the heart
of the merits, while standing is generally a question of law to be determined
by the court from the pleadings@).  We overrule the remainder of Lycoming=s first and third issues. 

IV. 
Legal Sufficiency of Fraud Damage
Evidence

A.        Standard of Review

In its eighth issue, Lycoming
challenges the legal sufficiency of the evidence supporting the actual damages
the jury found were caused by Lycoming=s fraud or fraudulent inducement.  To
determine whether the evidence is legally sufficient to support the judgment,
we review the entire record, crediting favorable evidence if reasonable jurors
could and disregarding contrary evidence unless reasonable jurors could not.  See
City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We assume that
jurors decided questions of credibility or conflicting evidence in favor of the
verdict if they reasonably could do so.  Id. at 819, 820.  We do not
substitute our judgment for that of the trier-of-fact if the evidence falls
within this zone of reasonable disagreement.  Id. at 822.  If the
evidence would enable reasonable and fair-minded people to differ in their
conclusions, then it is legally sufficient to support the verdict.  Id.

B.        Insufficient
Evidence of Harm

The jury was advised that, to find
Lycoming liable for fraud or fraudulent inducement, it must find that AInterstate@ was injured as a result of its
reliance on Lycoming=s misrepresentations or non-disclosures.  But the only
damages the jury found were caused by Lycoming=s fraudulent conduct are (1) the
increase in aviation products liability insurance premiums sustained in the
past, and (2) reasonable and necessary expert expenses incurred in the
investigation of the crankshaft failures.  For the reasons stated below, we conclude
that neither category of damages is recoverable by ISW on its own behalf or on
behalf of IFI.[27]








1.         Increased Aviation Products Liability
Insurance Premiums

On appeal, Lycoming argues that the
record does not support an award of actual damages consisting of the
unreimbursed increase in AInterstate=s@ aviation products liability insurance premiums, and
moreover, such damages are not legally cognizable.  ISW contends that the
increase in insurance premiums was foreseeable and directly traceable to
Lycoming=s fraud. 

The evidence in support of this
damage award consists almost entirely of the testimony of Ed Buker, who is the
president and CEO of Citation and the chairman of both IFI and ISW.  Buker
testified that the insurance premiums increased because AInterstate@ made an insurance claim in the
summer of 2002 as a result of Lycoming=s demand for indemnity. 
Specifically, Buker testified that the insurance premiums were $90,000 in June
2002, $795,000 in November 2002, $1.175 million in November 2003, and $1.051
million in November 2004.  At trial, ISW argued that this amounted to a $2.7
million increase in insurance premiums above the $90,000 baseline.  According
to Buker, AInterstate@ passed on $1 million of this increase to Lycoming by
increasing the price of crankshaft forgings produced pursuant to the
Replacement Crankshaft Agreement, leaving an unreimbursed insurance premium
increase of $1.7 million.  








We conclude there is legally
insufficient evidence to support this damage award.  Initially, we note there
is no evidence that Lycoming=s demand for contractual indemnity would have been a covered
claim under the relevant insurance policy.[28] 
Moreover, Buker testified only that the insurance premiums increased after AInterstate@ informed its insurer of Lycoming=s claim for indemnity, but in our
review of the record, we have not discovered evidence indicating when this
demand was made.  Although the record contains Lycoming=s demands for indemnity from IFI in
connection with the forgings that were not heat-treated, this claim was
settled, and was not at issue in this lawsuit.  The record also reflects
Lycoming=s demands for indemnity as asserted
in the Pennsylvania actions against IFI and Citation, but those demands were
made after this suit was filed and after AInterstate=s@ insurance premiums had increased. 
In our review of the record, we have discovered no evidence that Lycoming
demanded indemnity from ISW, and no acts by Lycoming that would result in an
increase in AInterstate=s@ insurance premiums in the summer of 2002.  

In addition, Buker=s testimony does not link the premium
increase with Lycoming=s fraudulent conduct; instead, his testimony indicates he
simply inferred that the premiums were increased because AInterstate@ informed its insurer that Lycoming
requested indemnity.  But damages Acannot be based on mere speculation
and hypothesis.@  McMillin v. State Farm Lloyds, 180 S.W.3d 183, 202
(Tex. App.CAustin 2005, pet. denied) (citing Formosa Plastics Corp. USA v.
Presidio Engineers & Contractors, Inc., 960 S.W.2d 41, 49B50 (Tex. 1998)).  ISW bore the burden
to establish that Lycoming=s fraud or fraudulent inducement caused damages, not that
Lycoming=s demand for indemnity was harmful. 
And ISW produced no evidence that the premium increase was the result of
Lycoming=s fraud or of the fraudulently-induced
Second Addendum.[29]  








There also is no evidence that a
premium increase was foreseeable. In fact, IFI successfully negotiated for the
deletion of the provision in the MSA that would have required IFI to maintain
insurance.  And it is uncontroverted that the same policy insured an affiliated
company, Rancho Cucamonga, which also manufactured aviation products.  Indeed,
ISW offered uncontroverted testimony that Citation is the policyholder, and the
policy affords coverage to Citation and all of its subsidiaries.[30] 


Finally, it is uncontroverted that
the premiums were paid by Citation.  Citation is not a party to the MSA, its
Addenda, or this lawsuit, and ISW asserted no claims on Citation=s behalf.  Thus, there is no evidence
to support the award of damages to ISW, on its own behalf or on behalf of IFI,
for Citation=s increased aviation products liability insurance premiums.

Lycoming argues that the absence of
evidence tracing the premium increase to Lycoming=s conduct illustrates one of the
primary problems with recognizing such a category of damages: increased
insurance premiums result from many concurring factors, including market forces
and the internal financial practices of the carrier.  See Higbie Roth
Constr. Co. v. Houston Shell & Concrete, 1 S.W.3d 808, 812B13 (Tex. App.CHouston [1st Dist.] 1999, pet. denied)
(citing Whirley Indus., Inc. v. Segel, 316 Pa. Super. 75, 82, 462 A.2d
800, 804 (1983) (per curiam));[31] cf. Moiel
v. Sandlin, 571 S.W.2d 567, 571 (Tex. Civ. App.CCorpus Christi 1978, no writ)
(stating that the increased insurance premiums in a malicious prosecution case
are Amore analogous to a prepayment for
attorney=s fees and expenses incurred in
defending . . . cases which are an incident of defending any civil
suit. . . .  [and are] not necessarily attributable solely@ to the defendant=s wrongful suit).  ISW argues that AInterstate=s premiums rose solely because
of Lycoming=s indemnity claimCexcluding the influence of any market factors.@  But the record contains no evidence
concerning these factors or the carrier=s assessment of risk posed by any of
the various companies covered by the policy.  








Even assuming that the premium
increases were linked to Lycoming=s demand for indemnity, the record
contains no evidence that Lycoming=s fraud or fraudulent inducement was
the cause of the premium increase.  Instead, the uncontroverted evidence
establishes that the policy and the premiums were the responsibility of
Citation, and there is no allegation that Lycoming defrauded Citation.  To the
contrary, Citation=s interests are not at issue in this case.  Because we
conclude there is less than a scintilla of evidence that Lycoming=s fraudulent conduct injured ISW or
IFI by causing them increased aviation products liability insurance premiums,
we do not reach Lycoming=s argument that Aopening the door to these damages
would enter a field with no sensible stopping point.@  See Vogel v. Liberty Mut. Ins.
Co., 214 Wis. 2d 443, 451, 571 N.W.2d 704, 708 (Wis. App. 1997). 

2.         Expert Witnesses= Fees

Lycoming also contends that the fees
paid to expert witnesses whose work was performed in preparation for litigation
are not recoverable as damages.  See Stanley Stores, Inc. v. Chavana,
909 S.W.2d 554, 563 (Tex. App.CCorpus Christi 1995, writ denied) (holding the trial court
erred in making an equitable award of expert witness fees absent statutory
authorization); Richards v. Mena, 907 S.W.2d 566, 571 (Tex. App.CCorpus Christi 1995, writ dism=d by agr.) (holding that costs of
experts Aare incidental expenses in
preparation for trial and not recoverable@ as court costs regardless of good
cause shown); King v. Acker, 725 S.W.2d 750, 755 (Tex. App.CHouston [1st Dist.] 1987, no writ)
(holding that prevailing party Acannot recover the costs of handwriting experts [as actual
damages because] . . . [t]hese are litigation expenses . . .@).  ISW contends that these fees are
investigative expenses recoverable as fraud damages, and although it cites no
binding precedent in support of this argument, it relies on the following
cases.  

a.         Holmes
v. P.K. Pipe & Tubing, Inc.








ISW first refers us to Holmes v.
P.K. Pipe & Tubing, Inc.  856 S.W.2d 530, 543 (Tex. App.CHouston [1st Dist.] 1993, no writ). 
In Holmes, the defendant leased property contaminated with chemical
waste to the plaintiff for storing pipe, and the lease required the plaintiff
to restore the site to its pre-lease condition.  Id. at 532B34.  The defendant did not disclose
the existence of the contamination, and the plaintiff stored approximately
seven million pounds of pipe directly over the covered waste.  Id. at
534.  The Texas Water Commission required the pipe to be removed and the land
restored, and the plaintiff hired Carden, an environmental engineer, to inspect
the site, review compliance plans, and act as a liaison with the Commission.  Id.
at 535.  The First Court of Appeals held that Ain light of the defendant=s misrepresentations, the trial court
did not err in awarding damages for expenses incurred in hiring environmental
engineer Carden, removing the pipe from the cap, and remediating the site.@  Id. at 543.  

Unlike the present case, the Holmes
court did not indicate that the engineer testified or that his work was
essential to maintain the action.  See id. at 535 (stating that the
expert Adid not testify about the contents of
his report or about any recommendations he made to the joint venture@).  Moreover, Carden=s work in assisting to remediate the
site was not a litigation expense, but was more in the nature of repair.  See
Stearman v. Centex Homes, 78 Cal. App. 4th 611, 625, 92 Cal. Rptr. 2d
761, 771 (2000) (reversing judgment that omitted fees incurred by experts to
analyze soil and perform design calculations necessary to create repair plan). 
Unlike the experts in Holmes and Stearman, the experts here were
not retained to repair or remediate any property owned or leased by the
plaintiff, but to prove the plaintiff=s Anon-liability.@[32]  

b.         Jackson
v. Julian








ISW next relies on Jackson v.
Julian.  694 S.W.2d 434 (Tex. App.CDallas 1985, no writ).  In Jackson,
the defendant physician allegedly misrepresented to the patient that another
doctor had removed her ovary.  The patient sued for fraud, alleging that she
justifiably relied on the misrepresentation and Aemployed an attorney . . . to
identify the doctor who removed the right ovary without her permission.@  Id. at 437.  The trial court
dismissed the cause of action for constructive fraud, in part because the
patient stated no damages.  The Fifth Court of Appeals reversed, stating that A[i]t may be inferred from this
allegation that she would not have hired an attorney if the doctor had not made
the alleged misrepresentation.  Thus, her pleadings sufficiently lay the
predicate that her reliance caused her to incur attorney=s fees.@  Id. at 437.  The court
further stated, ASince the patient seeks to recover the expense incurred in
hiring an attorney to investigate the other doctor, as distinguished from
the cost of prosecuting her action against Dr. Julian, we hold that such
investigative expense may be found to be proximately resulting from the doctor=s alleged misrepresentations.@  Id. (emphasis added).  

Again, there is no indication that
the attorney testified at trial.  See id.  In contrast to the expert in Jackson,
the experts here were not engaged to identify a proper party, but to defend
against actual or foreseeable claims for indemnity.  And also unlike the expert
in Jackson, the work of ISW=s experts formed the core of the
litigation.  See Prairie Producing Co. v. Angelina Hardwood Lumber Co.,
885 S.W.2d 640, 640B41 (Tex. App.CBeaumont 1994, writ denied) (op. on reh=g) (clarifying that fees for expert
testimony and opinion essential to maintain a party=s position in one lawsuit are not recoverable
as actual damages in another lawsuit). 

c.         United States ex rel. Wilkins v. North American
Construction Corp.








In addition, ISW directs us to United
States ex rel. Wilkins v. North American Construction Corp.  173 F. Supp.
2d 601, 647 (S.D. Tex. 2001) (amended mem. op.).  In this suit under the qui
tam provisions of the False Claims Act,[33]
the federal government alleged the injury and reliance elements of common-law
fraud.  Id. at 645.  The government claimed it incurred investigative
expenses in reliance on the contractors= false certification that their
Request for Equitable Adjustment (AREA@) was made in good faith.  Id. at
646.  The court held that the government adequately alleged injury and reliance
because the government was required by the Federal Acquisition Regulation to
investigate such certified claims.  Id. at 647.  

The analogous statutory duty in this
case is not borne by ISW, but by the National Transportation Safety Board,
which is required to investigate each civil aircraft Aaccident.@  See 49 U.S.C.A. ' 1132(a) (2007).  Unlike the present
case, the misrepresentation in Wilkins directly triggered the government=s statutory obligation to investigate
the claim.  The Wilkins court cited the standard for common-law
consequential fraud damages as set forth in Arthur Andersen & Co. v.
Perry Equipment Corp.,[34] and relying
on Jackson v. Julian, concluded that investigative expenses may be
consequential damages.  Id.  As previously noted, however, the Jackson
court distinguished expert fees incurred in prosecuting the case.  

d.         Versaggi Shrimp Corp. v. United States

Finally, ISW relies on Versaggi
Shrimp Corp. v. United States, another case under the False Claims Act.  See
28 Fed. Cl. 20, 22 (1993).  There, the Court of Federal Claims ordered the
plaintiff to reimburse the government=s costs of investigating a fraud
because Adamages associated with the
vindication of a common law right may include the costs of a related fraud
investigation.@  Id. at 26.  In support of this conclusion, the court relied
solely on Continental Management, Inc. v. United States.  See 527
F.2d 613, 618, 208 Ct. Cl. 501 (1975) (holding that proof that government
officials were bribed is sufficient to prove that the government was injured). 
In Continental Management, the court noted that bribery of officials
diminishes the public=s confidence in the government, and stated, AThe Government likewise incurs the
administrative costs of firing and replacing the venal employees and the costs
of investigation, all of which are compensable in fraud cases.@  Id.








As authority for this statement, the
court relied on United States v. Rex Trailer Co., 218 F.2d 880, 884 (7th
Cir. 1955) (AIt is well settled that in addition to actual losses[,] the government
is entitled to reimbursement of costs in connection with ferreting out and
investigation of the frauds.@) (emphasis added), aff=d on other grounds, 350 U.S. 148, 76 S. Ct. 219, 100 L.
Ed. 149 (1956) (upholding award authorized under the Surplus Property Act).  Rex
Trailer in turn relied on Helvering v. Mitchell.  See 303
U.S. 391, 401, 58 S. Ct. 630, 634 (1938).  There, the United States Supreme
Court explained:

The remedial character of sanctions
imposing additions to a tax has been made clear by this Court in passing upon
similar legislation.  They are provided primarily as a safeguard for the
protection of the revenue and to reimburse the Government for the heavy
expense of investigation and the loss resulting from the taxpayer=s fraud. 

Id. (emphasis added).

The Rex Trailer court also
relied on Stockwell v. United States.  80 U.S. 531, 547, 13 Wall. 531,
547, 20 L. Ed. 491 (1871) (holding that the Act of March 3, 1823 allowing the
federal government to maintain a civil action for double the value of illegally
imported goods is remedial and not penal).  In Stockwell, the Court
stated:

The act of abstracting goods
illegally imported, receiving, concealing, or buying them, interposes
difficulties in the way of a government seizure, and impairs, therefore, the
value of the government right.  It is, then, hardly accurate to say that the
only loss the government can sustain from concealing the goods liable to
seizure is their single value, or to assert that the liability imposed by the
statute of double the value is arbitrary and without reference to indemnification. 
Double the value may not be more than complete indemnity.  

Id.  








Thus, the line of cases on which Versaggi
Shrimp relies concerns the federal government=s right to recover enhanced damages,
and derives from cases that originally allowed the costs of investigations as
sanctions or exemplary damages under federal statutes.  This line of cases does
not stand for the proposition that, in the absence of an authorizing statute, a
private limited partnership suing for state common-law fraud may recover as
actual damages the fees and expenses of expert witnesses whose work and
testimony were  used at trial and were essential to prove its claims.[35] 
In sum, none of the cases on which ISW relies constitute precedent binding on
this court, and all of the cases are distinguishable.  

e.         Evidence
Regarding ISW=s Expert Fees

Finally, we find no evidence in the
record to distinguish the expert fees incurred in this case from any other
expert fees incidental to litigation.  To the contrary, the evidence
demonstrates that ISW=s experts were engaged to provide the proof supporting the Anon-liability@ declaration ISW requested in its
live pleadings.  This is most evident in the testimony of Ed  Buker.

Buker testified that he Adirected the filing of this lawsuit
in [his] various roles for Citation@ including his roles as president and
CEO of Citation and chairman of ISW.  He described the purpose of the
litigation as follows: 

Q:        So, this lawsuit was filed, was it not, sir,
by [ISW] in order to attempt to protect [IFI] from possible claims by
Lycoming?  That was the purpose of this lawsuit, wasn=t it, sir?

A:        My intention on filing this lawsuit was
to get enough data and information to find the root cause of the problem and
prove that it was not any part of Citation=s fault,
because I couldn=t get data from Lycoming any other way.[[36]]








Q:        So, your testimony is that you filed the
lawsuit in order to conduct an investigation?

A:        We began the investigation.  I wanted the
data that Lycoming had to help find the root cause of the problem which
Lycoming has still not proven to me.

. . .

Q:        You=re
not seeking any relief for B to allow you
to conduct an investigation, are you?

A:        I=m seeking relief that shows that it=s not my fault so I don=t have any reason to have any liability, Counsel.

Q:        And the company that has been threatened
with B that you believe was threatened with liability was
[IFI], was it not?

A:        I don=t
aim to look at it from that point of view.  They threatened my B they are made in one place by one group of people. 
There=s some legal structures, but they threaten a Citation
entity; and that=s the threat I take.

. . .

Q:        So, the real issue, in your mind, is that
there was a threat to the Citation entities as a whole. Correct?

A:        Correct.

Q:        You did not draw the distinctions between
the legal entities that might actually have liabilities, did you, sir?

A:        I did not.

Q:        And you had this lawsuit filed by [ISW] in
order to shield from an indemnity claim [IFI].  Correct?

A:        That=s one purpose of this.  There is
also the ability to find out the root cause to find out whether there is really
any liability on my part. 

(emphasis added).  








Moreover, no evidence was presented
that ISW=s experts actually investigated the
cause of the crankshaft failures before this suit was filed.  And although one
of ISW=s experts testified that he was
retained by ISW=s attorney in October 2002, no evidence was presented that
the experts at issue were retained independently of litigation.  To the
contrary, ISW presented the testimony of one of its attorneys, Martin E. Rose,
regarding (a) attorneys= fees, (b) expenses, and (c) expert fees Ain conjunction with the litigation.@  Specifically, he testified that the
expert fees incurred in conjunction with the litigation totaled $2,715,623.17. 
This figure is the identical amount found by the jury to represent the Areasonable and necessary expert
expenses incurred in the investigation of the crankshaft failures@ by AInterstate.@ 

Buker also testified:

Q:        And it=s
true, is it not, sir, that all of the experts that have been retained by
Interstate Southwest, Ltd., and who will testify here in this Court were hired
to do an investigation specifically for the purposes of this litigation?

A:        Absolutely.

Tellingly, the only expert hired
before this suit was filed was retained by one of the attorneys who represented
ISW at trial.  Attorney Bruce McKissock retained aircraft engine reconstruction
expert James Irvin[37] in October
2002Cthe same month the Flying Frog suit
was filedCbut Irvin testified that he did not prepare a plan to test Lycoming
engines until April 2003, and did not receive or prepare any Lycoming engines
for testing until May 2003.  He testified that he sought material from Lycoming
by asking ISW=s attorney to request information; based his opinions in part on review
of depositions taken in this case; and transmitted his test results only to ISW=s attorneys and to other experts used
in the litigation.   Each of the remaining experts was retained after suit was
filed.[38]   








On this record, we conclude that the
expert witness fees at issue are not actual damages caused by the fraudulent
conduct alleged but instead are litigation expenses.  See King, 725
S.W.2d at 755; see also City of Houston v. Biggers, 380 S.W.2d 700, 705
(Tex. Civ. App.CHouston 1964, writ ref=d n.r.e.) (holding that the Acost of experts and other expenses in
preparation for trial are merely incidental expenses@ of litigation).  There being no
remaining actual damages, we reverse those portions of the judgment
incorporating or relying on the jury=s findings that Lycoming committed
fraud or fraudulent inducement or that ISW or IFI sustained actual damages.  We
sustain Lycoming=s eighth issue[39] and render
judgment that ISW, on its own behalf and on behalf of IFI, take nothing on its
claims for fraud and fraudulent inducement.  Because the jury=s findings of fraud and fraudulent
inducement fail to provide a basis for those portions of the judgment that
relied on these findings, we also sustain Lycoming=s fifteenth and seventeenth issues in
part.[40]  

V.  Exemplary Damages

In its
tenth issue, Lycoming contends that, because the award for actual damages must
be reversed, the award of exemplary damages must be reversed as well.  See
Tex. Builders v. Keller, 928 S.W.2d 479, 482 (Tex. 1996) (per curiam)
(reversing punitive damage award after concluding there were no compensable
damages from fraud).  We agree.








Exemplary damages are not available
unless the plaintiff establishes that it sustained actual loss or injury as the
result of an underlying tort.  Tex. Civ.
Prac. & Rem. Code Ann. ' 41.004(a) (Vernon Supp. 2007); Fed.
Express Corp. v. Dutschmann, 846 S.W.2d 282, 284 (Tex. 1993) (per curiam) (ARecovery of punitive damages requires
a finding of an independent tort with accompanying actual damages.@).  A plaintiff cannot recover
punitive damages if its compensatory damage claim is precluded as a matter of
law.  Entergy Gulf States, Inc. v. Isom, 143 S.W.3d 486, 494 (Tex. App.CBeaumont 2004, pet. denied).  AThe mere availability of a tort-based
theory of recovery is not sufficient; actual damages sustained from a tort must
be proven before punitive damages are available.@  Twin City Fire Ins. Co. v. Davis,
904 S.W.2d 663, 665 (Tex. 1995).  Consequently, the exemplary damages awarded
here must be reversed.  See Tex. Builders, 928 S.W.2d at 482. We
therefore sustain Lycoming=s tenth issue and reverse that portion of the judgment
awarding ISW exemplary damages.

VI. 
Declaratory Relief

Lycoming argues in its fifteenth
issue that the record and jury=s findings are inadequate to provide a basis for declaratory
judgment and other equitable relief, including attorneys= fees.  In a subsidiary argument,
Lycoming contends that certain declarations are contrary to law.[41] 


We review declaratory judgments under the same standards as
other judgments and decrees.  Tex. Civ.
Prac. & Rem. Code Ann. ' 37.010 (Vernon 1997).  Thus, we
review the legal sufficiency of the evidence supporting the declaratory
judgments under the previously-described standard set forth in City of
Keller, and review conclusions of law de novo.  Smith v. Smith, 22
S.W.3d 140, 149 (Tex. App.CHouston [14th Dist.] 2000, no pet.).

A.        Declaration Regarding
Standing, Assignment, and Authority








In Declaratory Judgment 1, the trial
court ruled that (1) the Assignment Agreement validly assigned the MSA to
ISW; (2) the Assignment Agreement appointed ISW as IFI=s attorney-in-fact with power to
assert or enforce any claim or right Ain connection with any transferred
asset, including the [MSA]@ and thereby assigned to ISW the right to prosecute and
defend litigation related to the MSA and IFI; (3) ISW has standing to
prosecute and defend claims related to the MSA; and (4) ISW is authorized Ato assert the claims in this lawsuit,
in its own right as well as on behalf of [IFI].@  Although the last ruling addresses
only ISW=s capacity to assert the claims in
this case, the ruling is unnecessary because the trial court previously granted
summary judgment on Lycoming=s challenge to ISW=s capacity and Lycoming has not
challenged that judgment.  The first three rulings are problematic for a
different reason: these rulings purport to eliminate future challenges to ISW=s standing and capacity to litigate
claims related to the MSA on behalf of itself and on behalf of IFI.  Neither
the findings nor the record supports such broad relief.  

The Declaratory Judgment Act is
remedial in nature.  Tex. Civ. Prac.
& Rem. Code Ann. ' 37.002(b) (Vernon 1997); Republic Ins. Co. v. Davis,
856 S.W.2d 158, 164 (Tex. 1993).  It Acannot be invoked as an affirmative
ground of recovery to revise or alter@ existing rights or legal relations. 
Republic Ins., 856 S.W.2d at 164.  And as previously discussed, ISW=s right to prosecute and defend
litigation related to the MSA or to IFI depends on the particular claims
asserted and the language of the Assignment Agreement.  The trial court must
examine the pleadings to determine standing, and review the scope of the
assignment or power of attorney to assess capacity.  In this instance, ISW has
standing to assert the claims actually litigated, and Lycoming has waived its
challenge to ISW=s capacity to assert the claims in this lawsuit.  But these
circumstances do not necessarily apply to every claim ISW may assert in any
forum in the future, and declaratory judgment relief is inappropriate when Athe facts upon which the relief is
sought are subject to mutation and change.@  Tex. State AFL-CIO v. Brown,
378 S.W.2d 917, 922 (Tex. Civ. App.CAustin 1964, writ ref=d n.r.e.) (citing Cal. Prods. Co.
v. Puretex Lemon Juice, Inc., 160 Tex. 586, 591, 334 S.W.2d 780, 783 (Tex.
1960)). 








            In this case, ISW was not
authorized to litigate IFI=s claims for fraudulent conduct that occurred after the
Assignment Agreement was executed, but there is no basis in law or in the
record on which to conclude that Lycoming has waived its right to challenge ISW=s capacity to assert other claims in
other proceedings.  And although Lycoming waived the right to challenge the
trial court=s failure to dismiss based on ISW=s lack of capacity, Lycoming preserved
its challenge to declaratory judgments that are not supported by findings or
the record.  

Here, the ruling that ISW is
authorized to pursue IFI=s tort claims is not supported by the record because the
Assignment Agreement did not assign those claims or appoint ISW as its agent
with respect to torts that had not yet occurred.  See First Nat=l Bank in Dallas v. Kinabrew, 589 S.W.2d 137, 145 (Tex. Civ. App.CTyler 1979, writ ref=d n.r.e.) (AThe nature and extent of the
authority granted must be ascertained from the instrument granting the power of
attorney and such instrument is to be strictly construed to limit the authority
of the attorney in fact.@).  IFI appointed ISW as its attorney-in-fact with regard to
the assets transferred in 1996, but the tort claims at issue are not among
those assets, and there is no evidence that IFI=s subsequent tort claims were
assigned to ISW.  See State Fid. Mortgage Co. v. Varner, 740 S.W.2d 477,
480 (Tex. App.CHouston [1st Dist.] 1987, writ denied) (AAn assignee obtains only the right,
title, and interest of his assignor at the time of his assignment, and no more.@); Pape Equip. Co. v. I.C.S., Inc.,
737 S.W.2d 397, 399 (Tex. App.CHouston [14th Dist.] 1987, writ ref=d n.r.e.) (ATo recover on an assigned cause of
action, one must plead and prove that a cause of action capable of being
assigned existed and was assigned to the party alleging the theory of
assignment.@); Esco Elevators, Inc. v. Brown Rental Equip. Co., Inc., 670
S.W.2d 761, 764 (Tex. App.CFort Worth 1984, writ ref=d n.r.e.) (AIn order to recover upon an assigned
cause of action, one must allege and prove that there was a cause of action,
that it was a cause of action that could be assigned, and that it had been
assigned to him.@) (emphasis added).  








We see no basis on which to conclude
that the common-law fraud or fraudulent inducement claims relate back to any
point before the execution of the Assignment Agreement so as to render these
claims assignable before the unforeseeable fraudulent conduct occurred.[42] 
Because Declaratory Judgment 1 is not supported by the jury=s findings or by conclusive evidence,
we sustain Lycoming=s fifteenth issue in part and reverse the trial court=s first declaration.[43]


B.        Declarations Concerning Indemnity Under Untried
Legal Theories

In
Declaratory Judgment 3,[44] the trial
court ruled as follows:

Because a defect
in Defendant [Lycoming=s] design of the
crankshafts was the sole cause of the crankshaft failures
. . . [Lycoming] cannot recover, in whole or in part,
any . . . [Damages] . . . relating in any way to,
or arising out of, the crankshaft failures . . . from [ISW] and/or
[IFI] and/or their successors or assigns under the [MSA] or its Addenda,
Section 5.3 of the [MSA] or any other legal theory that would impose
liability on [ISW] and/or [IFI] and/or their
successors or assigns, regardless of whether [Lycoming] asserts
the right to recover such DAMAGES, if any, under the common law, case law,
statute, rule or otherwise, including but not limited to claims for
contribution, implied or express indemnity, negligence, strict liability or
breach of any express or implied contract or
warranty . . . .

(emphasis added). 
The trial court=s fourth and fifth declarations
contain similarly overbroad language.  In sum, the trial court ruled in these
judgments that Lycoming cannot recover any damages from IFI or ISW by relying
on (a) the MSA and its Addenda, or (b) any other legal theory, whether Acommon law, case
law, statute, rule or otherwise . . . .@  We hold these
conclusions are unsupported by the findings or the record.  













Assuming that the
MSA=s indemnity provisions
are enforceable, the findings do not support the trial court=s conclusions
because the facts found pertain to Lycoming=s indemnification
obligations rather than to the indemnification obligations of IFI or ISW.  
Under the second paragraph of section 5.3 of the MSA, IFI is required to
indemnify Lycoming for damages Aarising out of any claim,
lawsuit . . . recall, retrofit or government investigation
or proceeding against [Lycoming] relating to performance or
defect . . . for any Products manufactured by Seller
pursuant to [the MSA] except to the extent that such Damages are directly
caused by the negligence of [Lycoming].  (emphasis added).  In
asking the jury whether a design defect was the sole cause of the failures, ISW
appears to have focused on the first paragraph of section 5.3 of the MSA.  But
that provision does not address the obligations of IFI or ISW to indemnify
Lycoming; rather, it governs Lycoming=s narrower duty to
indemnify IFI Awhere liability is based solely on a defect in
design . . . .@  Although ISW had previously requested
declaratory judgment regarding Lycoming=s indemnification
obligations, it amended its pleadings to withdraw that request.  In its live
pleadings at the time of trial, ISW instead sought to clarify its own
indemnification obligations and those of IFI.  Specifically, in its Sixth
Amended Petition, ISW asked for a finding that all of Lycoming=s losses were
directly caused by Lycoming=s negligence, and thus, Lycoming was not
entitled to indemnity under the MSACan issue that
corresponds with the second paragraph of section 5.3.  The jury=s finding that a
design defect was the sole cause of the failures (as described in the first
paragraph of section 5.3) is not equivalent to a finding that Lycoming was
negligent (as described in the second paragraph of section 5.3),[45]
but instead pertains to a claim that was withdrawn.  And although Lycoming
proposed a jury question that would have determined whether the failures were
caused by Lycoming=s direct negligence as set forth in ISW=s pleadings, the
trial court sustained ISW=s objections to the proposed charge.[46] 


When a plaintiff
fails to request an issue and an affirmative finding regarding the omitted
issue is essential to recovery, the trial court must render judgment for the
defendant.  Dallas County Med. Soc=y v. Ubiñas-Brache, 68 S.W.3d 31, 40
(Tex. App.CDallas 2001, pet. denied).  In the absence of a jury
finding or conclusive evidence that the failures were directly caused by
Lycoming=s negligence, ISW
was not entitled to a declaration that Lycoming could not recover its losses
under the MSA as stated in this ruling. 

Moreover, we
cannot affirm the trial court=s judgment that Lycoming is barred from
recovery under any other theory.  This sweeping declaration is unsupported by
the record, which does not show that the issues tried included every legal
theory under Acommon law, case law, statute, rule or otherwise@ that Lycoming
might assert as a basis for indemnification.  Because these rulings address
unadjudicated claims and causes of action, we sustain Lycoming=s fifteenth issue
as it pertains to Declaratory Judgments 3, 4, and 5, and we reverse these
portions of the judgment. 

C.        Enforceability of Provision Requiring Seller to
Indemnify Buyer

In its eighteenth issue, Lycoming
contends the trial court erred in reaching the conclusion of law stated in
Declaratory Judgment 6:

The indemnification agreement
contained in the second paragraph of Section 5.3 of the MSA, which requires the
Seller to indemnify Buyer under certain circumstances[,] is unenforceable as a
matter of law because it does not meet the legal requirements for
indemnification agreements under Texas or Pennsylvania
law . . . .








ISW responds that the indemnity
provision is unenforceable because it does not satisfy the express-negligence
rule, which requires a party seeking indemnity for its own negligence to
express that intent within the four corners of the document.

We agree that the express-negligence
rule applies to this provision.  Here, the ASeller@ is required to hold Lycoming
harmless from all costs and damages: 

whether or not involving liability to
any third party, from or arising out of any claim,
lawsuit . . . recall, retrofit or government investigation
or proceeding against [Lycoming] relating to performance or defects (including
without limitation, manufacturing defects) . . . for any
Products manufactured by Seller pursuant to this Agreement, except to
the extent that such Damages are directly caused by the negligence of [Lycoming].









(emphasis added).  Although Lycoming
argues that the express-negligence doctrine does not apply because the
provision does not shift liability for Lycoming=s negligence, this interpretation
ignores the word Adirectly.@  The provision as written shifts liability for claims and
consequences of Lycoming=s negligence if causation is indirect.[47] 
Moreover, the express-negligence rule applies to indemnification for strict
liability claims.  Houston Lighting & Power Co. v. Atchison, Topeka,
& Santa Fe Ry. Co., 890 S.W.2d 455, 459 (Tex. 1994) (A[P]arties to an indemnity agreement
must expressly state their intent to cover strict liability claims in specific
terms.@).  In the absence of authority or
evidence to the contrary, we presume that Pennsylvania, like Texas, applies an
express-negligence rule to strict liability claims.  See Coca-Cola Co. v.
Harmar  Bottling Co., 218 S.W.3d 671, 685 (Tex. 2006) (ATexas courts can presume that
the determinative law of another state is the same as Texas law absent proof or
argument to the contrary . . . .@); see also Tex. R. Evid. 202 (addressing
determination of the law of other states).  Pennsylvania law also provides that
Aindemnification provisions are given
effect only when clearly and explicitly stated in the contract between two
parties.@  Bernotas v. Super Fresh Food
Mkts., Inc., 581 Pa. 12, 20, 863 A.2d 478, 483 (2004); see also Greer v.
City of Philadelphia, 568 Pa. 244, 248B49, 795 A.2d 376, 379 (2002) (stating
that indemnification provisions are enforced only if the language Aclearly and unequivocally
demonstrates that [the indemnitor] intended to provide such indemnification@).  

On appeal, Lycoming relies on Green
International, Inc. v. Solis to support its argument that the
express-negligence rule does not apply to Lycoming=s claim for reimbursement for its own
economic losses.  951 S.W.2d 384, 387 (Tex. 1997) (holding that a Ano-damages-for-delay@ contract clause that shifts economic
damages for breach of contract and does not shift liability for third-party
tort and negligence damages is not an indemnity agreement).  Here, however, the
contract provision at issue does shift liability for third-party claims, and
the economic losses for which Lycoming seeks indemnification[48]
are the result of a product defect to which the express-negligence rule
applies, rather than a contract claim to which the rule does not apply. 

We therefore conclude that the
indemnification provision found in the second paragraph of section 5.3 of the
MSA is unenforceable under Texas and Pennsylvania law.  Accordingly, we
overrule Lycoming=s eighteenth issue and affirm the trial court=s ruling  stated in Declaratory
Judgment 6.[49] 

VII.  ISW=s Claims of
Breach of Contract and Violation of Section 2.306

A.        ISW=s Contentions








In two cross-issues, ISW contends the
trial court erred in granting Lycoming a partial directed verdict.  In
analyzing a directed verdict, we apply the same standard of review applicable
to summary judgments and judgments notwithstanding the verdict.  See City of
Keller, 168 S.W.3d at 823.  Thus, we review the evidence in the light most
favorable to the non-movant, crediting favorable evidence if reasonable jurors
could and disregarding contrary evidence unless reasonable jurors could not.  Id.
at 827. 

Here, ISW challenges the directed
verdict denying its claim that Lycoming violated section 2.306 of the Business
and Commerce Code and breached the MSA by demanding more crankshaft forgings
than Lycoming actually required.  Section 2.306 generally governs requirements
contracts, and provides as follows:

A term which measures the quantity by
the output of the seller or the requirements of the buyer means such actual
output or requirements as may occur in good faith, except that no quantity
unreasonably disproportionate to any stated estimate or in the absence of a
stated estimate to any normal or otherwise comparable prior output or
requirements may be tendered or demanded.

Tex. Bus.
& Com. Code Ann. ' 2.306(a) (Vernon 1994).  Thus, the
Business and Commerce Code imposes a requirement of good faith on the buyer,
and limits the buyer=s ability to demand the product in an amount that is
unreasonably disproportionate to the Astated estimate.@ 

The MSA and its Addenda constitute a
requirements contract with the following pertinent provisions:

& 1.3   APlanning
Volumes@ means Buyer=s
[i.e., Lycoming=s] estimated annual requirements. 

. . .

& 2.2   Capacity Reservation.  Seller, at no expense or cost to
Buyer, will commit plant, equipment and personnel sufficient to support Buyer=s Planning Volumes for each part
number of Products.  Buyer will promptly advise Seller of Buyer=s initial Planning Volumes and
changes in the Planning Volumes.  Buyer may change its Planning Volume at any
time during any Contract Year by giving not less than six weeks prior written
notice to Seller.








ISW contends that after this suit was
filed, Lycoming began ordering more forgings than it required and stockpiled
the excess while it looked for a new supplier.  ISW further alleges that, A[a]s a result of running Lycoming=s unnecessary products on its press
forge, ISW incurred $359,200 in additional maintenance, additional overtime,
and increased set-up expenses.@  

Lycoming moved for partial directed
verdict on these claims on the grounds that: (1) there was no evidence
Lycoming ordered beyond its requirements, (2) there was no evidence  ISW
was damaged as a result of any violation of section 2.306, and (3) section
2.306 does not provide the basis for an affirmative claim and can only be used
defensively.  As discussed below, there is no evidence that ISW ordered beyond
its requirements or that ISW was damaged by the alleged increase; thus, we
affirm the partial directed verdict without reaching Lycoming=s contention that section 2.306 may
only be used as a defense.

B.        Claim Barred by Parties= Agreement

Section 2.306, like many other
provisions of Article 2 of the Uniform Commercial Code, Ais a gap-filler and may be varied by
the parties= agreement.@  Lenape Res. Corp. v. Tenn. Gas Pipeline Co., 925
S.W.2d 565, 570 (Tex. 1996) (op. on reh=g).  The statute provides the
quantity term only when the contract does not unambiguously specify the
quantity of the output of the seller or the requirements of the buyer.  Id.
(citing section 2.306(a)).  Here, Buker testified that the parties agreed
on the number of crankshafts to be produced during the relevant time period:

Q:        And in fact there was an agreement reached
between Citation and Lycoming on the number of crankshafts that would be
produced through the end of the MSA in May of 2005, correct?

A:        Correct.

. . .

Q:        And the agreement was for approximately
10,000 crankshafts to be produced by Citation for Lycoming, correct?

A:        Yes, sir.

Q:        And that=s
what you agreed to do?

A:        Yes, sir.

Q:        And you, in fact, did not do that, did you,
sir?








A:        We
did not, no.[[50]]

Because the parties reached an
agreement regarding the number of crankshaft forgings to be produced, we conclude
that section 2.306 does not apply.

C.        No Evidence of Damages

Regardless of whether ISW=s claim is styled as a claim for
violation of section 2.306 or as a common-law claim for breach of contract,
there is no evidence that Lycoming=s requirements caused damage.  ISW
argues on appeal that Lycoming increased its requirements after ISW filed suit
on April 23, 2003.  ISW then relies on Buker=s testimony to establish damages. 
But as Buker testified, these costs were incurred beginning in late 2001 or
2002, prior to the lawsuit and the alleged increase in requirements.  Moreover,
the costs were incurred as the result of ISW=s settlement with Lycoming over the
failure to heat-treat earlier forgings, resulting in a prior series of
crankshaft failures.  Buker testified that as part of that settlement, ISW
agreed to a change in processing, and it is that change which caused the
increase in costs:

A:        In one of our previous production runs we
failed to heat-treat correctly a component and sent it to Lycoming and they
caught it.  And we agreed, as part of the settlement, to build press-tooling
or hammer-tooling to put the parts on the press and we did that.

Q:        Do you recall approximately when the
press-forged 707 cranks[[51]] began in
production?

A:        I canCit
would have been sometime in late 2001, early 2002.

. . .

Q:        In connection with that conversion of the
crankshafts from the hammer-forge process to the press-forge process, has
Interstate incurredCor has that conversion impacted the operational costs
of Interstate?








A:        The conversion to press hasCon the press line it was converted to, it raised the
repair costs and the die change cycle on that press.

Q:        Explain what you mean by that.

A:        You have a lot of customers on one press;
and when you have more business coming on a press, you increase the amount of
die changes necessary to meet requirements.  If you had one die in there and
you ran it for 1,000 pieces, you could only run it for 750; you begin to change
more dies.  And it=s, basically, more repetitive die changes to do that.

Q:        As a consequence of running these parts on
the press, did you notice any effect on the equipment that was being used to
run these cranks?

A:        Yes, sir.[[52]]

Q:        Tell me about that.

A:        The runningCevery time we ran the Lycoming products, we had increased maintenance
costs for the heaters and a dramatically increased maintenance cost for the
roll reducer, the first step in making the billets smaller.  It=s the only job we run on the roll reducer now.  And
the press clutches started wearing out, instead of nine to ten months, in 90
days.

Q:        Have you attempted, Mr. Buker, to quantify
the additional expense incurred by Interstate as a consequence of running
these crankshafts on the press line?

A:        Yes sir, we have.

Q:        Can you tell me what that calculation is?

A:        We looked at the additional cost of
maintenance, the additional cost of overtime, and the reduction in uptime of
the press; and that cost is approximately $300,000Clet me get the exact number for you hereC350,000C$359,200.

Q:        359,200?

A:        Yes, sir.

Q:        And that represents what, sir?

A:        A combination of additional maintenance,
additional weekend overtime work, and spare parts to run these products.

Q:        Now, in connection with the conversion to
the press line, did you incur any increased setup expenses?

A:        That
would have been included in the $359,000.

(emphasis added.)  We further note
that ISW=s David Lisowski also testified that
by agreeing to settle these claims by retooling, Awe were going to make out on the
deal.@








On the record before us, we conclude
there is no evidence of damages to support ISW=s claim that Lycoming breached the
MSA, violated section 2.306 of the Business and Commerce Code, or damaged IFI
or ISW by increasing its requirements in bad faith after ISW filed suit.  Our
analysis is unaffected by ISW=s assertion that Lycoming admitted it was ordering ahead of
its actual needs, or stockpiling.  Specifically, ISW relies on the deposition
testimony of Ronald L. Clayton, one of Lycoming=s Procurement Managers, that A[w]e are buying crankshaft forgings
ahead on our current schedule.@ (emphasis added).  This testimony
pertains to facts as they existed on January 4, 2005 and concerns Lycoming=s purchases from a different
supplier.  We overrule ISW=s first cross-issue and affirm the partial directed verdict
without reaching ISW=s second cross-issue. 

VIII. 
Attorneys= Fees

The trial court awarded attorneys= fees and costs to ISW under the
Declaratory Judgments Act.  Under this Act, the trial court Amay award costs and reasonable and
necessary attorney=s fees as are equitable and just.@  Tex.
Civ. Prac. & Rem. Code Ann. ' 37.009 (Vernon 1997).  Here,
the jury made a finding regarding the fees that were Areasonable and necessary,@ and the trial court concluded, based
on the jury=s finding, that the award of attorneys= fees and costs was Aequitable and just.@  However, we are not Areasonably certain that the jury was
not significantly influenced by the erroneous amount of damages it considered.@  Barker v. Eckman, 213 S.W.3d
306, 313B14 (Tex. 2006).  In light of our
disposition of the issues on appeal, we reverse the award of attorneys= fees and costs and remand the case
solely for consideration of the costs and  reasonable, necessary, equitable,
and just attorneys= fees, if any, to award to either party.  Tex. R. App. P. 43.3; Young v.
Qualls, 223 S.W.3d 312, 314B15 (Tex. 2007) (per curiam); Neeley, 176 S.W.3d at
799.








IX.  Conclusion

Because ISW and IFI sustained no
actual damages, we reverse the judgment on the tort claims and render judgment
that ISW take nothing.  Because the trial court=s award of costs and attorneys= fees was expressly based on the jury=s findings and we are not reasonably
certain the jury was not significantly influenced by the erroneous amount of
damages it considered, we reverse the awards of costs and attorneys= fees  and remand solely for a
determination of the appropriate award, if any, to be made to either party in
light of this opinion.  We affirm the trial court=s declaration that the indemnity
provision found in the second paragraph of section 5.3 of the MSA is
unenforceable under Texas and Pennsylvania law, but we reverse the trial court=s rulings stated in Declaratory
Judgments 1, 3, 4, and 5, which are overly broad and unsupported by the
record.  We affirm the partial directed verdict dismissing ISW=s claims that Lycoming breached its
contract and violated section 2.306 of the Business and Commerce Code.  In sum,
our ruling leaves the trial court=s second and sixth declaratory
judgments intact but reverses the final judgment in all other respects.[53]


 

 

/s/                    Eva M. Guzman

Justice

 

 

 

Judgment rendered and Opinion filed
November 1, 2007.

Panel consists of Justices Anderson,
Guzman, and Senior Justice Hudson.* 

 








APPENDIX

 

[2]       Does
ISW lack standing to sue Lycoming for fraud and punitive damages on behalf of
IFI because the alleged assignment of rights from IFI to ISW predated by five
years the events that gave rise to these claims, and thus these claims could
not have been transferred to ISW from IFI by the assignment?

[4]       Did
ISW fail to introduce legally sufficient evidence that Lycoming knowingly made
any false, material representations of fact to ISW or IFI?

[5]       Did
ISW fail to introduce legally sufficient evidence that Lycoming had a Aduty to disclose@ facts to ISW or IFI in this
arms-length commercial relationship?

[6]       Even
assuming Lycoming owed a duty to disclose, did ISW fail to introduce legally
sufficient evidence that Lycoming fraudulently breached any such duty by
knowingly concealing material facts with intent to defraud ISW or IFI?

[7]       Did
ISW fail to introduce legally sufficient evidence of justifiable and
detrimental reliance, especially given that IFI=s chairman said he did not believe
Lycoming=s statements that IFI=s overheating during forging caused
the crankshaft failures?

[9]       Are
ISW=s Afraud@ claims really disguisedCand legally baselessCinchoate malicious prosecution
claims?

[11]     Did
ISW fail to introduce legally sufficient evidence to show, by Aclear and convincing@ evidence, that anyone at Lycoming
acted with fraud or malice that would justify the extraordinary remedy of
punitive damages?

[12]     Did
ISW fail to introduce legally sufficient evidence that a Lycoming Avice-principal@ engaged in, knowingly authorized or
approved fraudulent or malicious conduct?

[13]     Is
ISW=s punitive damage claim barred as a
matter of law because, at most, the fundamental dispute in this case involves a
reasonable, genuine disagreement regarding the cause of the crankshaft
failures?








[19]     Did
the trial court erroneously exclude from evidence the FAA report . . . that
analyzes the crankshaft failures at issue and concludes that IFI=s overheating during forging, not a
design defect, was the root cause of the failures?

[20]     Did
the trial court erroneously exclude other evidence that would have shown
Lycoming=s good faith state of mind and
demonstrated the integrity and thoroughness of its investigation and
conclusions about the cause of the crankshaft failures, including evidence that
one of Lycoming=s competitorsCTeledyneCexperienced similar failures and determined that overheating
was a cause of the failures of its crankshafts?

[21]     Did
the trial court erroneously exclude evidence, including Lycoming=s stipulation, that Lycoming was not
seeking and would never seek indemnity from ISW?

[22]     Did
the trial court=s jury instructions erroneously fail to distinguish between
ISW and IFI, conflating them into one single non-existent entity, AInterstate@?

[23]     Did
the trial court erroneously refuse to instruct the jury on when, if ever, a
duty to disclose that can give rise to a fraud claim arises in a commercial
context?

[24]     Did
the trial court erroneously refuse to instruct the jury that it could not
punish Lycoming for alleged conduct directed at third parties not before the
court or for conduct that occurred outside of Texas, and then erroneously allow
ISW=s counsel to argue that the jury
should punish Lycoming in order to vindicate the alleged rights of personal
injury victims around the nation, in direct violation of the due process
principles established by the U.S. Supreme Court in State Farm Mut. Auto.
Ins. Co. v. Campbell, 538 U.S. 408 (2003)?

[25]     Did
the trial court=s punitive damages instructions, which omitted basic legal
requirements, violate Texas law and due process?








[26]     Does
the $86.4 million damage award, which is 51 times larger than the relevant
compensatory portion of the judgment and 59% of AVCO=s net worth and 10% of its total
assets, violate Texas law because it exceeds the statutory punitive damages
cap, Tex. Civ. Prac. & Rem. Code ' 41.008(b)(1)(A), and ISW failed
to meet the requirements for exceeding the cap as a matter of law?

[27]     Does
the $86.4 million punitive damage award violate the federal constitutional
limits imposed by the Due Process Clause of the Fourteenth Amendment, see
State Farm, 538 U.S. 408 (2003)?









[1]    The pistons of the aircraft engines at issue connect
to rods that turn the crankshafts, and the crankshafts turn the propellers of
the aircraft.





[2]  Interstate Forging Industries, Inc. subsequently
converted to a limited liability company known as Citation Wisconsin Forging,
L.L.C.  For the sake of clarity, we have referred to this single entity as IFI.






[3]  The MSA originally provided that either party could
terminate the agreement immediately upon certain occurrences, including:

[t]he sale or transfer of more than fifty percent
(50%) of all or substantially all of the assets or stock or upon the occurrence
of any other transaction that results in a change of ownership or control of a
party unless the other party shall have expressly agreed thereto in writing . .
. .  

This provision was deleted in the First Addendum to
the MSA on May 4, 1995. 





[4]  As previously noted, Lycoming contends it had no
knowledge of IFI=s Assignment Agreement with ISW and did not know that
the crankshaft forgings were actually produced by ISW.  Thus, Lycoming
continued to direct its communications to IFI, and neither IFI nor ISW
corrected Lycoming. 





[5]  Lycoming=s
correspondence of July 27, 1999 and May 15, 2000 are both addressed to AInterstate Forging Industries[,] Inc.@





[6]  According to evidence offered by ISW, Lycoming had
previously asked that its forgings be produced using this method, but until the
settlement, the forging supplier had refused because the change would increase
the cost of production. 





[7]  AKsi@ is the abbreviation for Akilopounds per square inch@ and is a measurement of tension.





[8]  This letter is addressed to AInterstate Forging Southwest.@





[9]  Textron, Inc. and Avco Corporation are also parties
to the Release and Indemnity Agreement.





[10]  Flying Frog, L.L.C. v. Cessna Aircraft Co.,
No. H-02-3817, filed on October 8, 2002 in the United States District Court for
the Southern District of Texas, Houston Division.  





[11]  IFI later intervened in the suit, and Lycoming
objected on several grounds.  The trial court struck the intervention, and none
of the parties contend the trial court erred in doing so.





[12]  Act of May 21, 2001, 77th Leg., R.S., ch. 643, ' 3, 2001Tex. Gen. Laws 1208, 1209, eff. Sept. 1,
2001, amended by Act of June 2, 2003, 78th Leg., R.S., ch. 204, ' 13.06, 2003 Tex. Gen. Laws 847, 888B89, amended by Act of May 18, 2007, 2007 Tex.
Sess. Law Serv. ch. 593, ' 3.03 (H.B. 8) (West) (current version at Tex. Civ. Prac. & Rem. Code Ann. ' 41.008(c)(11) (Vernon Supp. 2007)).





[13]  The excluded evidence includes a certified copy of a
report entitled ALycoming Special Certification Review Team (SCRT)
Final Report@ (ASCRT Report@), which Lycoming describes as a report by the FAA. 
The trial court also excluded testimony about the SCRT Report or its
conclusions.





[14]  At the time this case was filed, Amalice@ was defined
as: (A) a specific intent by the defendant to cause substantial injury or harm
to the claimant; or (B) an act or omission: (i) which when viewed objectively
from the standpoint of the actor at the time of its occurrence involves an
extreme degree of risk, considering the probability and magnitude of the
potential harm to others; and (ii) of which the actor has actual, subjective
awareness of the risk involved, but nevertheless proceeds with conscious
indifference to the rights, safety, or welfare of others.  Act of April 20,
1995, 74th Leg., R.S., ch. 19, ' 1, 1995 Tex.
Gen. Laws 108, 109, amended by Act of June 11, 2003, 78th Leg.,
R.S., ch. 204, ' 13.02, 2003 Tex. Gen. Laws 847, 887 (current version
at Tex. Civ. Prac. & Rem. Code Ann.
' 41.001(7) (Vernon Supp. 2007)). 





[15]  See Tex.
Civ. Prac. & Rem. Code Ann. ' 41.008(c)(11)
(Vernon Supp. 2007) (providing an exception to statutory limitations on
exemplary damages when the defendant knowingly or intentionally secures the
execution of a document by deception).





[16]  See Tex.
Civ. Prac. & Rem. Code Ann. '
37.009 (Vernon 1997) (A[I]n any proceeding under this chapter, the court may
award costs and reasonable and necessary attorney=s fees as are equitable and just.@).





[17]  Issues are discussed in the order reached; issues we
do not reach are enumerated in the attached Appendix.





[18]  Lycoming=s
issues were independently numbered under several headings; for clarity,
however, we refer to the issues as if they were numbered in a single continuous
list.





[19]  Specifically, Lycoming asks, ADoes Texas law bar ISW=s >defensive=
declaratory judgment claim on the indemnity issue in this case because ISW
asserted that claim on behalf of IFI only after Lycoming had filed its
suit against IFI seeking indemnity and raising the same issues in Pennsylvania?@





[20]  ISW also alleged business disparagement regarding
ISW=s Aperformance of
the forging process,@ and claimed that Lycoming disparaged Athe general character of its business . . . .@  These claims were subsequently abandoned, and the
question of ISW=s standing to assert such a claim is not before us.  See
Westgate, Ltd. v. State, 843 S.W.2d 448 (Tex. 1992) (sub. op.) (AIt is a party=s
request for jury issues and instructions, not its pleadings, that determine
whether a cause of action is preserved.@).





[21]  We express no opinion on this issue.





[22]  We further note that if Lycoming=s argument were correct, then this court would have
been obliged to dismiss ISW=s declaratory
judgment claims based on the absence of standing when the case was previously
before us on appeal.  Instead, we expressly stated that the Texas suit could
continue.  AVCO, 145 S.W.3d at 266. 





[23]  See also Phillips v. Wertz, 546 S.W.2d 902,
(Tex. Civ. App.CDallas 1977, writ ref=d n.r.e.) (stating that Athe
attempted unilateral >stipulation= by
defendants= counsel that defendants would not violate the court=s order [does not] constitute proof that defendants
would discontinue their attempts to use the land@ and holding that plaintiff was entitled to a permanent injunction
restraining defendants from using the disputed property).





[24]  See Nootsie, 925 S.W.2d at 661 (stating that
the legal authority to act is a question of capacity).





[25]  Because Lycoming waived its challenge to ISW=s capacity, we need not determine, before reaching the
merits of the appeal, whether the scope of ISW=s authority actually encompasses the claims it asserts on IFI=s behalf.





[26]  This issue is not resolved by our conclusion that
ISW has standing as IFI=s attorney-in-fact to assert IFI=s tort claims, because we determine a party=s standing to pursue claims on its own behalf
separately from its standing to pursue claims as a representative.  See
Elizondo v. Tex. Natural Res. Conservation Comm=n, 974
S.W.2d 928, 931B32 (Tex. App.CAustin
1998, no pet.) (holding that plaintiff lacked standing to sue in her individual
capacity); cf. El T. Mexican Rests., Inc. v. Bacon, 921 S.W.2d 247, 251B52 (Tex. App.CHouston
[1st Dist.] 1995, writ denied) (capacity but not standing to sue devolves upon
shareholders of incapacitated corporation; thus, shareholders must sue as
representatives of the corporation).





[27]  On appeal, ISW adds that it was injured because it
was named as a defendant in the Flying Frog litigation.  But the
plaintiffs in that suit named IFI, not ISW, as a co-defendant with Lycoming. 
In support of its statement that ISW was a defendant in Flying Frog, ISW
cites correspondence in which its attorney asked Lycoming=s attorney to substitute ISW for IFI in a settlement
and release agreement.  This correspondence is dated June 9, 2003Ctwo years after the Second Addendum was executed, over
a month after this suit was filed, and more than two weeks after Lycoming filed
suit against IFI in Pennsylvania. Moreover, ISW=s attorney represented to the trial court that AInterstate@
did not settle with the Flying Frog plaintiffs.  And regardless of
whether IFI or ISW was named as a defendant in Flying Frog, we see no
basis on which to consider this an injury caused, directly or indirectly, by
fraud or a fraudulently-induced execution of the Second Addendum on behalf of
IFI or ISW.  Cf. Butler v. Morgan, 590 S.W.2d 543, 545 (Tex. Civ. App.CHouston [1st Dist.] 1979, writ ref=d n.r.e.) (holding that a plaintiff claiming malicious
prosecution fails to allege damage Aconforming
to legal standards@ because the damage Aflowed, directly or indirectly, from the fact that suit was filed@).





[28]  The policy at issue is not in the record, and there
is no evidence of the carrier=s coverage
position.





[29]  Most of the failures occurred in engines using
crankshafts made from earlier forgings produced pursuant to the original MSA.  





[30]  Buker testified that Rancho Cucamonga made no
claims, and that the various Citation companies followed an internal accounting
practice that charged the premiums to ISW and Rancho Cucamonga.  There is no
evidence that Lycoming made a demand for indemnity from either of these
companies.





[31]  In the body of the Whirley opinion, the
appellees= names are spelled Segal.





[32]  As Buker testified, AI=m seeking relief that shows that it=s not my fault so I don=t have any reason to have any liability, Counsel.@





[33]  31 U.S.C.A. ''
3729-3730 (2003).





[34]  945 S.W.2d 812, 816 (AConsequential damages, on the other hand, result naturally, but not
necessarily, from the defendant=s wrongful
acts.  Under the common law, consequential damages need not be the usual result
of the wrong, but must be foreseeable, and must be directly traceable to the
wrongful act and result from it.@)
(citations omitted); see also Stuart v. Bayless, 964 S.W.2d 920, 921 (Tex.
1998) (per curiam) (stating that consequential damages in a contract action Aare not recoverable unless the parties contemplated at
the time they made the contract that such damages would be a probable result of
the breach@). 





[35]  ISW additionally cites Guaranty Service Corp. v.
American Employers= Insurance Co. 
898 F.2d 453 (5th Cir. 1990) (per curiam) (applying Mississippi law and holding
that the plaintiff can recover Ainvestigation
expenses incurred prior to the litigation . . . if it can prove that
[plaintiff] would not have incurred the expenses but for [defendant]=s misrepresentations and concealments@) (emphasis added)). Neither of the cases on which Guaranty
Service Corp. relied concerned the recovery of expert witness fees as
actual damages for fraud.  See Miss. Power & Light Co. v. Pitts, 181
Miss. 344, 179 So. 363, 366 (1938) (addressing sufficiency of evidence to
recover lost profits for breach of contract); Shell Petroleum Corp. v.
Yandell, 172 Miss. 55, 158 So. 787, 790 (1935) (same).  





[36]  This is an inaccurate legal conclusion.  A person
may petition the court for an order authorizing the taking of a deposition on
oral examination or on written questions to investigate a potential claim or
suit.  Tex. R. Civ. P. 202.1(b); see
also Tex. R. Civ. P. 201.1
(governing depositions in foreign jurisdictions for use in Texas proceedings);
203.4 (governing exhibits to depositions).  The scope of discovery in such a
pre-suit deposition Ais the same as if the anticipated suit or potential
claim had been filed.@  Tex. R. App.
P. 202.5.





[37]  This expert is also referred to as AJames Ervin.@





[38]  This suit was filed on April 23, 2003.  Irvin
testified that he visited a source for Lycoming engines on March 26, 2003, but
began receiving the engines in May 2003.  He then sent various samples and data
to companies identified as SIMI and Matco, and there is no evidence that either
company=s work was performed before suit or outside this
litigation.  Dr. Anthony J. DeArdo was hired fifteen or eighteen months before
he testified in January 2005; thus, he appears to have been hired by June
2003.  Dr. DeArdo worked with metals cut by Matco from material received from
Irvin.  Thermotemp performed work for ISW on April 6, 2004, nearly a year after
suit was filed.  Packer Engineering and its affiliated experts, Dr. John Meyer
and Dr. Roch Shipley, were retained in June 2004.  Dr. John Naumann was
retained in September 2004.  Chuck van Karsen performed some of the
calculations for Drs. DeArdo and Meyer, both of whom were hired during the
course of this litigation.  As Dr. John Meyer for Packer Engineering testified,
AIt was actually pretty frustrating, initially, because
there seemed to beCdespite the maturity of the case, we were brought in
to work on the case relatively recently.@





[39]  Lycoming stated this issue as follows:

[8.]       Did ISW fail to introduce legally sufficient evidence that
any alleged fraud proximately caused ISW or IFI to suffer damages, because (a)
increased insurance premiums and expert witness fees incurred during litigation
are not recoverable as damages in Texas, and (b) in any event, there is no
evidence of proximate cause because the alleged act of relianceCentering into the Second AddendumCis not related to the alleged increase in insurance
premiums or expert witness costs?





[40]  Lycoming argues in its fifteenth issue that the
findings of the jury and the trial court Afail
to provide a basis for the declaratory judgment and other equitable relief, as
well as attorneys= fees, awarded by the trial court[.]@  In its seventeenth issue, Lycoming asserts that the
trial court erred when it purported to rescind the indemnity provision of the
MSA that required IFI to indemnify Lycoming Aas
a result of the jury=s finding of fraud . . . .@





[41]  Lycoming also challenged the declaratory judgments
as defensive pleadings, and we have addressed that argument in our discussion
of standing.





[42]  The Texas Supreme Court has also Aprohibited assignments that may skew the trial process
[and] confuse or mislead the jury . . . .@ PPG Indus., Inc. v. JMB/Houston Ctrs. Partners
L.P., 146 S.W.3d 79, 90 (Tex. 2004).  





[43]  When reversing a declaratory judgment, an appellate
court generally renders the judgment the trial court should have rendered. 
Here, however, ISW did not ask the trial court to interpret the contract, but
instead asked only that the trial court make certain specific findings.  We
therefore do not go beyond the requested relief, but restrict our rulings to
reversing the trial court=s conclusions that are not supported by evidence or
authority.   





[44]  We discern no challenge to Declaratory Judgment 2.





[45]  See Humble Sand & Gravel, Inc. v. Gomez,
146 S.W.3d 170, 181 n.17 (Tex. 2004):

The care taken by the supplier of a product in its
preparation, manufacture or sale, is not a consideration in strict liability;
this is, however, the ultimate question in a negligence action.  Strict
liability looks at the product itself and determines if it is defective. 
Negligence looks at the acts of the manufacturer and determines if it exercised
ordinary care in design and production. 

(quotation omitted); see also Armstrong Rubber Co.
v. Urquidez, 570 S.W.2d 374, 375B76
(Tex. 1978) (holding that the doctrine of strict liability Aapplies even though the seller has exercised care in
the preparation and sale of the product . . . .@).





[46]  Lycoming proposed the jury question: ADo you find that all of Lycoming=s losses related to the crankshaft forgings provided
under the MSA were directly caused by the negligence, if any, of Lycoming?@  ISW objected and argued that it was entitled to the Afactual determination@ of whether a design defect was the sole cause of the failures. 





[47]  Such indirect causation could be found, for example,
in cases of vicarious liability.





[48]  As previously noted, Lycoming has asserted its
claims for indemnification in Pennsylvania, rather than in this action.





[49]  We further note that this determination is an
independent reason to conclude that neither IFI nor ISW were fraudulently
induced to enter a contract extending its indemnity obligations for another
five years.  See Haase v. Glazner, 62 S.W.3d 795, 800 (Tex. 2001)
(stating that a party cannot be fraudulently induced to enter an unenforceable
contract).





[50]  There is no evidence that Citation, ISW, or IFI
produced crankshafts under a reservation of rights or otherwise performed under
protest.  Moreover, in one of the Pennsylvania proceedings, Citation and IFI
agreed to the entry of an Agreed Order for Preliminary Injunction requiring them
to produce the crankshaft forgings.  This order was entered on June 12, 2003,
less than two months after this lawsuit was filed. 





[51]  This is the crankshaft model that experienced the
failures at issue in this suit.





[52]  Objection and ruling omitted.





[53]  In light of our disposition, we do not reach ISW=s second cross-issue or the remaining issues presented
by Lycoming, which are enumerated in the attached Appendix.





*  Senior Justice J. Harvey Hudson sitting by
assignment.